UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| **V. ERIKA SMITH, PH.D., et al.,** | : | **Case No. 09-CV-2604** |
| **Plaintiffs,** | : | |
| | : | **JUDGE KATHLEEN M. O'MALLEY** |
| **v.** | : | |
| **BOARD OF TRUSTEES** | : | **MEMORANDUM & ORDER** |
| **LAKELAND COMMUNITY** | : | |
| **COLLEGE, et al.,** | : | |
| **Defendants.** | : | |

Before the Court is Defendants' Motion for Partial Dismissal of Plaintiffs' Amended Complaint (Doc. 10).  This motion has been fully briefed and is ripe for adjudication.  For the reasons articulated below, Defendants' Motion is **GRANTED in part** and **DENIED in part**.

I.      **BACKGROUND**

    A.      **Factual Background[1]**

        1.      **The Parties**

Plaintiff V. Erika Smith, Ph.D. ("Smith") is an African American female formerly employed by Defendant Lakeland Community College ("Lakeland") as an English instructor.[2]

The fifteen named Defendants can be divided into four groups: (1) the Board of Trustees of

---

[1]Unless otherwise noted, the following facts are derived from the Amended Complaint.

[2]Although Plaintiff's husband, Jeffrey M. Smith, is also a named plaintiff in this case, his sole cause of action for loss of consortium is entirely derivative of his wife's claims.  For ease of reference, the Court refers only to V. Erika Smith as the Plaintiff.

Lakeland Community College ("the Board"); (2) Lakeland;[3] (3) nine individually-named Board Members;[4] and (4) four individually-named Lakeland Officials/Employees.[5]  The Board Members are each sued in their capacity as board members and in their individual capacities.  Similarly, the Lakeland Officials/Employees are all sued in their capacity as Lakeland employees and in their individual capacities.  (Doc. 3 at 5.)

### 2.      Smith's Employment with Lakeland

On August 16, 2006, Smith began her employment as a full-time tenure track instructor in Lakeland's English Department.  (Doc. 3 at ¶ 12.)  Smith was employed under a probationary contract for the 2006-2007 academic year, and was subsequently renewed for the 2007-2008 and 2008-2009 academic years.  Smith alleges that she received student evaluations of approximately 4.5 out of 5 for each academic year.  (*Id*. at ¶¶ 13-14.)

As a full-time faculty member, Smith was a member of the Lakeland Faculty Association ("LFA").  As such, the "Agreement Between the Lakeland Faculty Association and the Lakeland

---

[3]Neither party discusses Lakeland's legal status in their briefing.  It appears, however, that Lakeland is a community college as defined in O.R.C. § 3354.01(C).  "Ohio has statutorily created [] three types of institutions for higher education.  They are, the state college or university *** the state community college ***and the community college."  *Farra v. Sinclair Community College*, No. 2005-10411-AD, 2006 Ohio 1019, ¶ 11 (Ohio Ct. Cl. Feb. 14, 2006) (quoting *Nimmo v. Southern State Community College*, No. C-1-83-738 (S.D. Ohio Nov. 19, 1985) (unreported)).  While "the state college or university, is clearly an arm of the state," the "third type of institution, the community college, is not an arm of the state; rather it is a political subdivision. . . ." *Id*.  Because neither party addresses the impact of Lakeland's legal status on Smith's ability to hold any of the Defendants liable, the Court will not address it at this stage.

[4]The individual Board Members include: Kenneth M. Iwashita, David Kalina, Ryan Callender, Ernest Lallo, Kip Molenarr, Dr. Kathleen T. Malec, Raymond F. McGuinness, Ken Quiggle, and Linda Williams.

[5]The individual Lakeland Officials/Employees include: Morris W. Beverage, Jr. (President); Frederick W. Law (Vice President, Provost, Dean of Faculty); Donald J. Killeen (Dean); and Meryl Soto-Schwartz (English Department Co-Chair).

2

Community College, 2008 - 2010" ("the CBA") governed the terms of Smith's employment.

Pursuant to the CBA, faculty members were permitted to "select the courses that they would teach during any academic year based upon a method agreed upon with the specific academic department." (*Id*. at ¶ 18.)  Smith alleges that, from August 2006 until the present, Lakeland's English Department permitted its faculty members to select the courses they would teach based on seniority.  (*Id*. at ¶ 19.)  She further alleges that the chairman and/or co-chairman of the English Department had "no supervisory authority over full-time faculty members within the department." (*Id*. at ¶ 20.)

### 3.      Defendants Meryl Soto-Schwartz and Donald J. Killeen

Several of Smith's claims stem from or relate to Defendant Meryl Soto-Schwartz and Defendant Donald J. Killeen's alleged conduct.  At all times relevant to the Amended Complaint, Defendant Soto-Schwartz was employed as one of the co-chairs of Lakeland's English Department and Defendant Killeen was employed as Dean.[6]  (Doc. 3 at ¶ 5.)

According to Smith, Defendant Soto-Schwartz "has demonstrated a pattern of animus regarding African American faculty members, in the English Department and other academic departments." (*Id*. at ¶ 22.)  Smith alleges that Defendants Morris W. Beverage, Jr. (Lakeland's President), Frederick W. Law (Lakeland's Vice President, Provost, and Dean of Faculty), and Killeen knew that Defendant Soto-Schwartz harbored animus towards African American faculty members. (*Id*. at ¶ 21.)

### 4.      The Dispute Regarding Smith's Course Selection

During an English Department meeting in the spring of 2008, Defendant Soto-Schwartz

---

[6]Smith refers to Defendant Killeen as "Dean" but does not indicate whether he is the dean of a specific academic department.

singled Smith out and verbally abused her regarding the courses she had selected to teach during the 2008-2009 academic year.  (*Id*. at ¶ 60.)  Specifically, Smith selected to teach English 1111, which she alleges most other faculty members do not like to teach. (*Id*. at ¶ 63.)   According to Smith, Defendant Soto-Schwartz "has never made an issue of the courses selected by White English Department faculty members" and has never verbally abused white faculty members regarding their course selection.  (*Id*. at ¶¶ 61-62.)

In the summer of 2008, Smith met with Defendant Killeen to discuss her annual review and, at that time, Defendant Killeen, "suggested that she consider changing her course schedule for fall 2008."  (*Id*. at ¶ 29.)  According to Smith, deans of the various academic departments at Lakeland do not typically get involved in faculty members' course selection.  (*Id*. at ¶ 31.)

In the fall of 2008, English Department faculty were asked to submit their course schedules for the spring 2009 semester.  Smith, exercising "her privilege and right under the CBA to select the courses of her choice," again chose to teach English 1111 in the spring of 2009.  (*Id*. at ¶¶ 67-68.) On October 16, 2008, Smith sent Defendant Killeen an email indicating that she "exercised her right to choose" the courses she would teach for spring 2009.  (*Id*. at ¶ 35.)   Smith copied two LFA officials on the email to Defendant Killeen.  (*Id*.)

Subsequently, on October 27, 2008, Smith met with Defendant Killeen to discuss her decision to teach English 1111.  (*Id*. at ¶ 36.)  Although an LFA official was planning to attend the meeting to represent Smith, the official "decided that perhaps Defendant Killeen would feel threatened if she attended." (*Id*. at ¶ 37.) During that meeting, Defendant Killeen claimed that Smith never taught anything other than English 1111.  (*Id*.) Smith claims, however, that she also taught English 1120, 2250, and 2275.  (*Id*.)  According to Smith, Defendant Killeen "became verbally abusive, condescending and displayed volatile behavior" toward her during the meeting.  (*Id*. at

4

¶ 38.)  When Smith asked that the meeting be postponed so that she could have a union official with her, Defendant Killeen responded: "Why is it that every time I talk to someone in this office they're talking about the union?"  (*Id*. at ¶ 39.)  According to Smith, Defendant Killeen has not been verbally abusive or displayed volatile behavior towards male faculty members.  (*Id*. at ¶ 40.)

On November 10, 2008, Smith received a letter from Defendant Killeen advising her that her decision to teach the course she selected "would have consequences."  (*Id*. at ¶ 43.)  Smith gave a copy of this letter to the LFA officials.

### 5.    Non-Renewal of Smith's Probationary Contract

On or about January 23, 2009, Smith was notified that her probationary contract would not be renewed for the 2009-2010 academic year.  (Doc. 3 at ¶ 3.)   Smith alleges that her nonrenewal was based on Defendant Killeen's recommendation and that neither Defendant Law nor Defendant Beverage gave her an opportunity to present her side of the story.  (*Id*. at ¶¶ 46-48.)

### 6.    Events Following Non-Renewal of Smith's Contract

Smith filed a grievance and appealed the nonrenewal of her probationary contract to the Board.  She claims that the Board approved the nonrenewal "without ever hearing a presentation of the facts from either her or a representative of the LFA on her behalf."  (*Id*. at ¶ 50.)  Beyond this bare statement, however, there are no other allegations in the Amended Complaint regarding the LFA's participation in any grievance process on Smith's behalf.

Defendants allege, and Smith does not dispute, that she filed a unfair labor practice charge with the Ohio State Employment Relations Board ("SERB").  (Doc. 10 at 4 n. 1.)[7]  The SERB

---

[7]Although Smith does not refer to it in her Amended Complaint, the Court can consider the SERB's dismissal of Smith's unfair labor practice charge, which was attached as an exhibit to Defendants' Motion to Dismiss.  Courts can take judicial notice of "proceedings in other courts of record, records and reports of administrative bodies, and EEOC determinations."  *Williams v.*

dismissed the charge in September 2009, finding no probable cause to believe Lakeland violated O.R.C. § 4117.11 and that "[i]nformation gathered during the investigation revealed that Ms. Smith refused to sign up for additional courses as instructed by her supervisor, and informed [Lakeland] that she had no intention to teach the courses in the future."  (Doc. 10-1 at 1.)  The SERB further found that protected activity did not appear to be a factor in Lakeland's decision to not renew Smith's contract.  (*Id*.)

Smith alleges that: (1) she filed a Charge of Discrimination with the Ohio Civil Rights Commission; and (2) on or about August 7, 2009, the EEOC issued a Dismissal and Notice of Suit Rights (Doc. 3 at ¶ 7.)  In the Dismissal, the EEOC stated that it "adopted the findings of the state or local fair employment practices agency that investigated this charge."  (Doc. 1-1.)

### 7.     The Collective Bargaining Agreement

It is undisputed that Smith's employment with Lakeland was subject to the CBA.  The CBA at issue is an Agreement between the Lakeland Faculty Association and the Lakeland Community College and is effective from 2008 to 2010.  Smith attached the relevant portions of the CBA to her original Complaint.  (Doc. 1-2.)

### a.  Grievance Procedure (Article II)

Article II of the CBA sets forth a grievance procedure and provides that "exhaustion of this grievance procedure is required as to all disputes within its scope, as defined in Section A."  (Doc. 1-2 at 5 (Article II, § C(6))).  Section A states that:

A grievance shall mean a claim of an employee, employees, or the Association that there has been a violation, misinterpretation, or misapplication of an express

---

*Allstate Ins. Co.*, No. 5:04cv2435, 2005 U.S. Dist. LEXIS 40799, *5 n.1 (N.D. Ohio April 19, 2005).  The Court may, therefore, properly consider the SERB dismissal without converting Defendants' Motion into one for summary judgment.

provision of this Agreement, or that it has not been equitably applied to the detriment of the grievant.

(*Id*. at 2 (Article II, § A(1))).  The CBA's detailed five-step Grievance Procedure culminates in a "final and binding" appeal to an impartial arbitrator.  (*Id*. at 4 (Article II, § 5)).[8]  This section of the CBA further states that, "[n]othing contained herein shall deny to any individual or the College or the Association its rights under state or federal constitutions or law."  (*Id*. at 4.)

### b.  Working Conditions (Article III)

There are several provisions in the CBA relating to faculty working conditions and scheduling.  Of particular relevance to the allegations in Smith's Amended Complaint, the CBA contains a section specifically dealing with class load selection.  (Doc. 1-2 at 7-9.)  The CBA provides, in relevant part, that:

- It shall be the responsibility of the Executive Vice-President and Provost to administer instructional load policy as specified within this Agreement.  A normal load shall be thirty (30) semester units per academic year with assignments per semester ranging between thirteen (13) and seventeen (17) units per term, inclusive.  The Chief Academic Officer, Faculty Member's Dean, and Faculty Member together may agree on an equivalent workload.  (Doc. 1-2 at 7 (Article III, § B(1)).)

- First consideration for load shall be given to full-time faculty who are members of the bargaining unit within the department, then the division, and then the College who are qualified to teach the course offerings.  (*Id*. at 8 (Article III, § 6(a)).)

### c.  Faculty Contracts (Article IV)

Article IV, Section A of the CBA provides that "[f]aculty members shall be employed by the College under either probationary contracts or continuing contracts with tenure . . . All individual

---

[8]Step one grievances involve an oral discussion with the employee's supervisory administrator.  (Doc. 1-2 at 2.)  At the second step, the grievance is reduced to writing on the form known as "grievance procedure form" and is filed with the Vice-President.  (*Id*.)  Third step grievances involve the LFA filing an appeal to the President of the College.  (*Id*. at 3.)  At the fourth step, the LFA can request that the grievance be heard by the Board of Trustees.  (*Id*.)  Finally, step five is an appeal to an impartial arbitrator.  (*Id*.)

employment contracts shall be made consistent with this Agreement which shall be deemed incorporated by reference in such individual contracts." (Doc. 1-2 at 15.)  With respect to new faculty members, the CBA states that all such employees "shall be awarded a probationary contract upon their employment by the College." (*Id*.)

During the course of a probationary contract year, if an "administrator who can affect renewal or nonrenewal becomes aware of any deficiencies, he/she shall notify the faculty member of such deficiencies and work with the faculty member in an effort to overcome such deficiencies." (*Id*. at 15 (Article IV, § B(3)).)  The CBA provides that:

> In the event that a decision is made not to renew the appointment of a faculty member employed on a probationary contract, the faculty member shall be notified in writing that such a determination has been made on or before April 1, of the contract year. If a faculty member who receives such a notice requests, the reasons which underlie the determination of nonrenewal shall be provided to the faculty member in writing.

(*Id*. (Article IV, § B(4)).)  This section further sets forth the procedure by which a faculty member can request that the Board of Trustees review the nonrenewal determination. (*Id*. at § B(6).) Specifically, Section B(6) states, in part, that:

> If any faculty member who receives a notice of nonrenewal believes that the reasons for nonrenewal are not valid, such faculty member shall have the right to have the determination of nonrenewal reviewed by the Board of Trustees.  To initiate such a review, the faculty member shall submit a request for review in writing to the President of the College for transmittal to the Board of Trustees.

(*Id*.)  The decision of the Board "shall be final and binding on all parties as it relates to the reasons for nonrenewal." (*Id*.)

### d.  Faculty Rights (Article IX)

Article IX, Section C provides that "[t]he Board will not discriminate against any employee in any manner because of employee's race, color, creed, religion, national origin, age, handicap, marital status, sex, sexual orientation, or political belief or association." (Doc. 1-2 at 19.)  In

8

addition, this section states that "[n]othing in this section is intended to prohibit an employee from seeking appropriate legal relief." (*Id.*)

### B. Procedural History

Smith filed her original Complaint on November 5, 2009. (Doc. 1.) On November 21, 2009, Smith filed an Amended Complaint (Doc. 3) asserting seven (7) causes of action against the Defendants. While the Amended Complaint does not label the causes of action and some of her claims seem to overlap, Smith appears to allege the following: (1) racial discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-5, 42 U.S.C. § 1981(a), and O.R.C. § 4112.02, *et seq*. (Count I); (2) denial of equal rights to make and enforce contracts in violation of 42 U.S.C. § 1981(a) (Count II); (3) retaliation under O.R.C. § 4112.02, *et seq*. (Count III); (4) sex discrimination in violation of O.R.C. § 4112.02, *et seq*. (Count IV); (5) wrongful termination (Count V); (6) defamation (Count VI); and (7) loss of consortium on behalf of Smith's husband, Jeffrey (Count VII).

On January 12, 2010, Defendants moved to dismiss a number of Smith's claims under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. (Doc. 10.) Smith filed a Memorandum in Opposition to Defendants' Partial Motion to Dismiss on March 1, 2010 (Doc. 13), and Defendants filed a Reply in Support on March 15, 2010 (Doc. 14). Smith has not sought to amend her Amended Complaint, either in response to Defendants' motion detailing deficiencies in the Amended Complaint, or otherwise.

## II. STANDARDS OF REVIEW

Defendants bring their Motion to Dismiss pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.

**A.   Standard of Review Under Rule 12(b)(1)**

Defendants move to dismiss some of Smith's claims for lack of subject matter jurisdiction. Where subject matter jurisdiction is challenged in a Rule 12(b)(1) motion, the plaintiff bears the burden of proving jurisdiction.  *Moir v. Greater Cleveland Regional Transit Auth.*, 895 F.2d 266, 269 (6th Cir. 1990).  Rule 12(b)(1) motions to dismiss for lack of subject matter jurisdiction fall into two general categories: facial attacks and factual attacks.  Fed. R. Civ. P. 12(b)(1); *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994).

A facial attack challenges the sufficiency of the pleading itself.  Where the Rule 12(b)(1) motion presents a facial attack, the Court accepts the material allegations in the complaint as true and construes them in the light most favorable to the nonmoving party, similar to the standard for a Rule 12(b)(6) motion.  *Id*. (citing *Scheuer v. Rhodes*, 416 U.S. 232, 235-37 (1974)).

In contrast, a factual attack is "not a challenge to the sufficiency of the pleading's allegation, but a challenge to the factual existence of subject matter jurisdiction."  *Id*.  Where the motion presents a factual attack, the allegations in the complaint are not afforded a presumption of truthfulness and the Court weighs the evidence to determine whether subject matter jurisdiction exists.  On a factual attack, the Court has broad discretion to consider extrinsic evidence, including affidavits and documents, and can conduct a limited evidentiary hearing if necessary.  *See DLX, Inc. v. Kentucky*, 381 F.3d 511, 516 (6th Cir. 2004); *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990).

**B.   Standard of Review Under Rule 12(b)(6)**

The Court may dismiss a claim for failure to state a claim upon which relief can be granted under Federal Rule of Civil Procedure12(b)(6).  The purpose of a motion under 12(b)(6) is to test the sufficiency of the complaint – not to decide the merits of the case.

10

It is well-established that a complaint need not set forth in detail all of the particularities of the plaintiff's claim. *See Myers v. Delaware Co.*, No. 2:07-cv-844, 2009 U.S. Dist. LEXIS 98143, *6 (S.D. Ohio Oct. 22, 2009).  Instead, Rule 8(a)(2) of the Federal Rules of Civil Procedure requires only a "short and plain statement of the claim showing that the pleader is entitled to relief."  Rule 8 does not, however, "unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1950 (2009).  While legal conclusions can provide the framework for a complaint, all claims must be supported by factual allegations. *Id*.  The Supreme Court has indicated that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. at 1949; *see also Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)("[A] formulaic recitation of the elements of a cause of action" is insufficient).

To withstand a motion to dismiss pursuant to Rule 12(b)(6), a complaint must plead facts sufficient "to state a claim for relief that is <u>plausible</u> on its face." *Twombly*, 550 U.S. at 570 (emphasis added).  The requisite facial plausibility exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S.Ct. at 1949.  The plausibility requirement is not the same as a "probability requirement" but instead "asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. Therefore, where a complaint pleads facts that are "merely consistent with" the defendant's liability, "its stops short of the line between possibility and plausibility of entitlement to relief." *Id*. (citing *Twombly*, 550 U.S. at 557).  Examining whether a complaint states a plausible claim for relief is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*. at 1950.

A district court considering a motion to dismiss must construe the complaint in the light most

11

favorable to the plaintiff and accept all well-pleaded allegations in the complaint as true.  *See Grindstaff v. Green*, 133 F.3d 416, 421 (6th Cir. 1998); *Iqbal*, 129 S.Ct. at 1950 ("When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.").  Where the well-pleaded facts "do not permit the court to infer more than the mere possibility of misconduct," the complaint fails to state a claim. *Iqbal*, 129 S.Ct. at 1950.  In sum, the allegations in the complaint must "raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.

In ruling on a motion to dismiss, a court may consider: (1) any documents attached to, incorporated by, or referred to in the pleadings; (2) documents attached to the motion to dismiss that are referred to in the complaint and are central to the plaintiff's allegations, even if not explicitly incorporated by reference; (3) public records; and (4) matters of which the court may take judicial notice.  *Whittiker v. Deutsche Bank National Trust Co.*, 605 F.Supp.2d 914, 924-25 (N.D. Ohio 2009); *Ruth v. Unifund CCR Partners,* No. 5:08CV2689, 2009 U.S. Dist. LEXIS 17362, *11 (N.D. Ohio Mar. 6, 2009)("In determining whether to grant a Rule 12(b)(6) motion, the court 'may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to the defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein.'"); *Greenberg v. Life Ins. Co.*, 177 F.3d 507, 514 (6th Cir. 1999); *see also* Fed.R.Civ.P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is part of the pleading for all purposes.").

## III.  **DISCUSSION**

Defendants argue that: (1) Smith's Title VII claims (Count I) against Defendants in their individual capacities must be dismissed because there is no individual liability under Title VII; (2) Counts I (racial discrimination) and IV (sex discrimination) must be dismissed as against the

individually-named Defendants because they contain conclusory allegations of discrimination; (3) the claims set forth in Counts II, III, and V "are aimed squarely at violations of the CBA" and therefore must be resolved through the grievance procedure set forth in the CBA; (4) Smith's defamation claim (Count VI) fails as a matter of law because it is unsupported by factual allegations; and (5) the loss of consortium claim on behalf of Smith's husband Jeffrey (Count VII) fails because there are no allegations that Smith suffered the requisite "bodily injury."

Smith has, in large part, failed to address the arguments raised in Defendants' Motion to Dismiss.  For example, Smith's responsive briefing groups Counts II, III, and V together and refers to them, without any discussion or analysis, as "contractual claims."  In the Amended Complaint, however, Counts II and III cite to, and appear to assert violations of, state and federal statutory rights. In addition, Smith's briefing provides no analysis with respect to her defamation and loss of consortium claims.  Despite these deficiencies, the Court must consider the sufficiency of Smith's claims as they are alleged in the Amended Complaint.

The Court considers each of the arguments set forth in Defendants' Motion in turn.

### A.  Individual and Official Capacity Claims Under Title VII (Count I)

In Count I of the Amended Complaint, Smith asserts claims for racial discrimination under Title VII, 42 U.S.C. § 1981, and O.R.C. § 4112.02.  Defendants argue that Smith's Title VII claims against the individually-named Board Members and Lakeland Employees ("the Individual Defendants") must be dismissed because individuals are not subject to personal liability under the statute.  (Doc. 10 at 5.)  In response, Smith concedes that she cannot hold any of the Individual Defendants liable in their individual capacities, but argues that she can maintain her Title VII claims against Defendants Beverage, Law, Killeen, and Soto-Schwartz in their official capacities.  (Doc.

13 at 3.)[9]

Title VII prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e-2(a)(1).  The statute defines an employer as "a person engaged in an industry affecting commerce who has fifteen or more employees . . . and any agent of such person." 42 U.S.C. § 2000e.  The term "agent," as it is used in Title VII, is not defined.  The Sixth Circuit has interpreted an "agent" as "an individual who serves in a supervisory position and exercises significant control over plaintiff's hiring, firing or conditions of employment." *Wathen v. Gen. Elec. Co.*, 115 F.3d 400, 405 (6th Cir. 1997) (citing *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 803 (6th Cir. 1994)).

It is well-established in the Sixth Circuit that an individual employee or supervisor who does not otherwise qualify as an employer cannot be held personally or individually liable under Title VII. *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 571 (6th Cir. 2000); *Little v. BP Exploration & Oil Co.*, 265 F.3d 357, 362 (6th Cir. 2001) ("The law in this Circuit is clear that a supervisor who does not otherwise qualify as an employer cannot be held personally or individually liable under Title VII."); *Wathen*, 115 F.3d at 405 ("We now hold that an individual employee/supervisor, who does not otherwise qualify as an 'employer,' may not be held personally liable under Title VII.").  The parties agree that none of the thirteen (13) individually-named Defendants can be held personally liable under Title VII.  Accordingly, Smith's Title VII claims against the Individual Defendants in their personal capacities are **DISMISSED** with prejudice.

Smith argues, however, that she can assert her Title VII claims against Defendants Beverage,

---

[9]Smith does not argue that any of the individually-named Board Members can be held liable in an official capacity.

14

Law, Killeen, and Soto-Schwartz in their official capacities.  Defendants have not responded to this argument, and, notably, they only seek dismissal of the Title VII claims against the Defendants in their *individual* capacities – not in their *official* capacities.

Although Smith cites the Sixth Circuit's decision in *Johnson* in support of her official capacity claims, she provides no analysis and fails to explain how Defendants Beverage, Law, Killeen, and Soto-Schwartz qualify for official capacity liability under Title VII.[10]  With respect to official capacity Title VII claims, the Sixth Circuit has explained that:

> While the law is clear that a supervisor cannot be held liable in his or her individual capacity for violations of Title VII, there is support for the proposition that a supervisor may be held liable in his or her official capacity upon a showing that he or she could be considered the 'alter ego' of the employer.

*Little*, 265 F.3d at 362 n.2.  The court continued by noting that it "has not clearly and definitively ruled on this issue and [] need not do so today" because the plaintiff failed to show that the individually-named supervisor "had significant control over Plaintiff's hiring, firing and working conditions such that he could be considered the 'alter ego' of [the defendant]."  *Id*.

In a 2009 decision in the Southern District of Ohio, the court noted that "the issue of whether

---

[10]In *Johnson*, the court held that the plaintiff's Title VII claims were permissible against the university and against the president of the university in his official capacity.  *Johnson*, 215 F.3d at 571; *see also Cox v. Shelby State Community College,* 48 Fed. Appx. 500, 505 (6th Cir. 2002) (finding that, although the college president could not be liable to suit in his individual capacity under Title VII, he could be liable in his official capacity); *see also Baba-Singhri v. Central State University*, No. 3:03cv429, 2008 U.S. Dist. LEXIS 18355 *24 (S.D. Ohio Mar. 10, 2008) (citing *Johnson* for the proposition that "claims under Title VII can only proceed against individuals, in their official capacities, who otherwise qualify as 'employers,'"and concluding that "Plaintiff's Title VII claims may not proceed against the individual Defendants, in their individual capacities (although they may proceed against CSU and the individual Defendants, in their official capacities)").  Contrary to Smith's apparent suggestion, the *Johnson* court did not specifically address the extent to which supervisors can be held liable in their official capacities. *See Reagan v. City of Knoxville*, No. 3:07-cv-189, 2008 U.S. Dist. LEXIS 7286, *10 (E.D. Tenn. Jan. 31, 2008) (noting that "the Sixth Circuit has declined to address the extent to which supervisors may be held liable in their official capacity").

15

a supervisor may be held liable under Title VII in his or her official capacity 'apparently remains unresolved in this Circuit.'" *Freshwater v. Mount Vernon City Sch. Dist. Bd. of Educ.*, No. 2:09-cv-464, 2009 U.S. Dist. LEXIS 114346, *11-13 (S.D. Ohio Dec. 8, 2009) (quoting *Monsul v. Ohashi Technica U.S.A., Inc.*, No. 2:08-cv-958, 2009 U.S. Dist. LEXIS 68680, *6 (S.D. Ohio Aug. 6, 2009)). As was the case in *Little*, the *Freshwater* court found that it need not decide the issue because the plaintiff made no allegations that the individually-named board member "had significant control over hiring, firing, and working conditions such that she could be considered the 'alter ego' of the Board of Education." *Id.* at *14.[11] Accordingly, the court granted the defendant's motion to dismiss as it related to plaintiff's official capacity (and individual capacity) Title VII claims against the individually-named defendant. *Id.; see also Reagan v. City of Knoxville*, No. 3:07-cv-189, 2008 U.S. Dist. LEXIS 7286, *10-11 (E.D. Tenn. Jan. 31, 2008) (applying similar reasoning and declining to hold individually-named supervisors liable in their official capacity under Title VII, "particularly as the City of Knoxville is a defendant in this suit").

Here, Smith argues that she can assert Title VII claims against Defendants Beverage, Law, Killeen, and Soto-Schwartz in their official capacities. The Amended Complaint seeks to hold these named Defendants liable "as Defendant College's employees, and as individuals." (Doc. 3 at 5.) The factual allegations in the Amended Complaint raise at least a possibility that Defendants Beverage, Law, Killeen, and Soto-Schwartz had varying degrees of control over Smith's working conditions and termination. For example, Smith alleges that: (1) Defendant Soto-Schwartz is the Co-Chair of the English Department; (2) Defendant Killeen conducted Smith's annual review in the summer of 2008; (3) Defendant Killeen recommended to Defendant Law that her probationary

---

[11]The individually-named board member at issue in *Freshwater* was the Director of Teaching and Learning. 2009 U.S. Dist. LEXIS 114346 at *3, 11-13.

contract not be renewed; (4) Defendants Law and Killeen recommended to Defendant Beverage that her contract not be renewed; and (5) Defendant Beverage "approved the non-renewal of [Smith's] probationary contract." (Doc. 3 at ¶¶ 5, 29, 46-49.)  At this stage in the proceedings, the Court finds that Smith has alleged sufficient facts to assert official capacity Title VII claims against Defendants Beverage, Law, Killeen, and Soto-Schwartz, particularly since Defendants have not specifically sought dismissal of Count I on these grounds.[12]

Accordingly, the Individual Defendants (Kenneth M. Iwashita, David Kalina, Ryan Callender, Ernest Lallo, Kip Molenarr, Dr. Kathleen T. Malec, Raymond F. McGuinness, Ken Quiggle, Linda Williams, Morris W. Beverage, Jr., Frederick W. Law, Donald J. Killeen, and Meryl Soto-Schwartz) are entitled to dismissal of the Title VII claims against them in their individual capacities.  Smith is, at this stage, allowed to proceed with her Title VII claims against Defendants Beverage, Law, Killeen, and Soto-Schwartz in their <u>official</u> capacities.[13]

### B.  Liability of the Individually-Named Defendants Under Counts I & IV

While Count I of the Amended Complaint alleges racial discrimination in violation of Title VII, 42 U.S.C. § 1981, and O.R.C. § 4112.02, Count IV asserts sex discrimination under O.R.C. § 4112.02.  Defendants argue that both of these claims should be dismissed against all thirteen (13) of the Individual Defendants under Rule 12(b)(6) because they contain "only conclusory allegations

---

[12]Courts "regularly dismiss as redundant claims against agents in their official capacities when the principal entity is also named as a defendant in the suit."  *Carter v. Del. County Bd. of Comm'rs*, No. 2:07-cv-1189, 2009 U.S. Dist. LEXIS 16436, *42 (S.D. Ohio Mar. 3, 2009).  Lakeland is a named Defendant in this case.  Defendants have not argued that the Title VII claims against Defendants Beverage, Law, Killeen, and Soto-Schwartz are redundant, and the Court need not address the issue at this stage.

[13] In reaching this conclusion, the Court does not express any opinion on the sufficiency of Smith's allegations against these Defendants or Smith's likelihood of success on her Title VII claims against them.

of race and sex discrimination." (Doc. 10 at 5.) In response, Smith contends that the Amended Complaint "is very clear in detailing the discriminatory conduct engaged in by Defendants Beverage, Law, Killeen, and Soto-Schwartz." (Doc. 13 at 4.) While the Court has already concluded that the Title VII claims against the Individual Defendants in their personal capacities must be dismissed because Title VII does not authorize such claims, individual capacity claims are viable, in some circumstances under O.R.C. § 4112.02 and 42 U.S.C. § 1981. The Court, accordingly, must assess the extent to which Smith's Complaint asserts such claims.

Title VII prohibits employers from discriminating against employees on the basis of "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2. O.R.C. § 4112.02 "prohibits the same conduct as a matter of State law, and is generally construed in an identical fashion to Title VII." *Shoemaker-Stephan v. Montgomery County Bd. of Comm'rs*, 262 F.Supp.2d 866, 874-76 (S.D. Ohio 2003). Likewise, 42 U.S.C. § 1981 prohibits racial discrimination in the "making, performance, modification, and termination of contracts."

The Sixth Circuit has recognized that the same framework used to evaluate a Title VII discrimination claim applies to discrimination claims under § 1981 and O.R.C. § 4112.02. *See Noble v. Brinker Int'l, Inc.*, 391 F.3d 715, 720 (6th Cir. 2004) ("The Ohio courts have held that the evidentiary standards and burdens of proof applicable to a claimed violation of Title VII . . . are likewise applicable in determining whether a violation of Ohio Rev. Code § 4112 has occurred.") (quoting *Williams v. Ford Motor Co.*, 187 F.3d 533, 538 (6th Cir. 1999)); *see also Cox v. Shelby State Comm. College,* 48 Fed. Appx. 500, 506 (6th Cir. 2002) ("in order to survive a motion to survive a motion to dismiss, a § 1981 plaintiff must establish a *prima facie* case of discrimination under McDonnell-Douglas"); *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm.*, 421 N.E.2d 128, 131 (Ohio 1981). Because the same analysis applies to Smith's

18

racial discrimination claims and her sex discrimination claim, and because the parties group them together in their briefing, the Court considers the sufficiency of these claims together.

A racial discrimination claim can be established through either direct or circumstantial evidence. *Johnson*, 215 F.3d at 572.  Absent direct evidence,[14] courts analyze discrimination claims using the burden-shifting framework first instituted in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and later refined by *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981). Under this framework, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination.[15]

To set forth a claim of discrimination, a plaintiff must show that she: (1) is a member of a protected class; (2) was subject to an adverse employment decision; (3) was qualified for the position; and (4) was treated differently than a similarly-situated individual outside the protected class. *Talley v. Bravo Pitino Restaurant, Ltd.*, 61 F.3d 1241, 1246 (6th Cir. 1995).  The burden of establishing a *prima facie* case "is not onerous, but one easily met."  *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000).  It is well-established, moreover, that "an employment

---

[14]Here, Smith does not allege direct evidence of discrimination "which, if believed, requires a conclusion that unlawful discrimination was at least a motivating factor in the [Defendants'] actions" and "does not require a factfinder to draw any inferences" to reach that conclusion. *See Hout v. City of Mansfield*, 550 F.Supp.2d 701, 721 n.6 (N.D. Ohio 2008) (citing *Kicak v. Comm. Health Partners of Ohio, Inc*., 400 F.3d 466, 470 (6th Cir. 2005)).

[15]The *McDonnell Douglas* burden-shifting framework involves three stages.  First, the plaintiff bears the initial burden of demonstrating a *prima facie* case of discrimination.  *Burdine*, 450 U.S. at 252-53.  Second, if the plaintiff demonstrates a *prima facie* case, the burden then shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the adverse employment action.  *Id*.  And third, if the defendant meets this obligation, the burden shifts back to the plaintiff to prove that the proffered nondiscriminatory reason was merely a pretext for discrimination.  *Id*. at 253.  At all times, the ultimate burden of persuasion remains with the plaintiff to establish that the adverse employment action was the result of unlawful discrimination.  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993).

discrimination plaintiff need not plead a prima facie case of discrimination to survive a motion to dismiss." *Cotton v. Cleveland Mun. Sch. Dist.*, No. 1:08cv1079, 2009 U.S. Dist. LEXIS 49569, *13 n.4 (N.D. Ohio June 11, 2009) (citations omitted).

First, as an African American woman, Smith is a member of two protected classes. As to the second requirement, Smith was subject to an adverse employment action: Lakeland did not renew her probationary contract. While there is no express allegation that Smith was qualified for the instructor position, she does allege that she received student evaluations of approximately 4.5 out of 5 for each academic year and that her "peer and administrative evaluations were exceptional/outstanding during her time at Defendant College." (Doc. 3 at ¶¶ 12-15.) Therefore, Smith sufficiently alleges the third element. Finally, as to the fourth requirement, Smith alleges that she was singled out and received disparate treatment based on her race and gender. Specifically, Smith alleges that she was treated differently from: (1) white faculty members, who were permitted to select the courses they would teach consistent with their rights and privileges under the CBA (Count I); and (2) male faculty members who were not subjected to verbal abuse in connection with their course selection (Count IV).

With respect to Smith's racial discrimination claims, her allegations against Defendants Beverage, Law, Killeen, and Soto-Schwartz are sufficiently specific to survive a motion to dismiss, albeit barely so. As to each of these named Defendants, Smith has alleged facts to demonstrate that they either knew of, approved of, or participated in, activities connected to the alleged discriminatory conduct. In the Amended Complaint, Smith alleges the following:

- Defendants Beverage, Law, and Killeen were aware that Defendant Soto-Schwartz "harbor[s] animus regarding African American faculty members, in the English Department and other academic departments." (Doc. 3 at ¶ 58.)

- Defendant Soto-Schwartz "has demonstrated a pattern of animus regarding African

20

American faculty members." (*Id*. at ¶ 59.)

- During an English Department meeting in the spring of 2008, Soto-Schwartz singled Smith out and verbally abused her as to the courses Smith selected to teach for the 2008-2009 academic year.  (*Id*. at ¶ 60.)

- Defendant Soto-Schwartz informed Defendant Killeen that she had an issue with Smith's course selection, and as a result, Defendant Killeen suggested that Smith change her course schedule for the fall of 2008.  (*Id*. at ¶¶ 27-29.)

- Defendant Killeen had never before "suggested to any White English Department faculty members that those faculty members consider changing the courses they had selected to teach."  (*Id*. at ¶ 64.)

- In a letter dated November 10, 2009, Defendant Killeen advised her that her course selection decision "would have consequences."  (*Id*. at ¶ 71.)

- "Defendant Killeen recommended to Defendant Law that [Smith's] probationary contract not be renewed, with which Defendant Law concurred and Defendant Beverage approved and Defendant Board upheld."  (*Id*. at ¶ 72.)

While Smith does not identify any similarly situated non-minorities who she alleges were treated differently, which arguably is required by *Twombly*, at this early stage of the proceedings, the Court declines to dismiss Smith's racial discrimination claims against Defendants Beverage, Law, Killeen, and Soto-Schwartz on those grounds.

As to Smith's sex discrimination claim, however, her allegations focus solely on Defendant Killeen's conduct, and do so only cryptically.  Smith alleges that, during a meeting on October 27, 2008, "Defendant Killeen became verbally abusive, condescending and displayed volatile behavior toward [Smith], a female."  (Doc. 3 at ¶ 93.)  Smith further alleges that Defendant Killeen has not engaged in similar conduct when dealing with male faculty members.  (*Id*. at ¶ 94.)  There are no other allegations regarding Smith's sex discrimination claim.  As currently alleged, therefore, Smith has not asserted any sex discrimination claims against Defendants Beverage, Law, or Soto-Schwartz; Count IV must, therefore, be **DISMISSED** as to those Defendants.

Turning to Defendant Killeen, the Court finds that Smith's claims fall woefully short of the obligations imposed upon her by *Twombly* and *Iqbal*.  Smith alleges only that Killeen was "verbally abusive," and that he used "condescending language and/or display[ed] volatile behavior."  (Doc. 3 at ¶¶ 95-96.)  These conclusory allegations, without more, are insufficient to make her sex discrimination claim plausible, particularly since there are no allegations linking this conduct to the nonrenewal of Smith's probationary contract.  In addition, Smith has not identified a similarly situated member of an unprotected class who was treated differently.  Accordingly, Count IV is **DISMISSED** with respect to Defendant Killeen.

Similarly, nowhere in the Amended Complaint does Smith allege that the nine (9) individual board members played any part in the discrimination and retaliation alleged.  Indeed, in her responsive briefing, Smith merely submits that dismissal of the individual board members "at this juncture and preliminary stage of litigation would be premature" and that she should be permitted to pursue discovery to determine whether these individuals engaged in conduct that would subject them to individual liability.  (Doc. 13 at 2.)  Because there is nothing in the Amended Complaint to suggest that the individual Board Members took any discriminatory action towards Smith, Counts I and IV are **DISMISSED** with respect to the nine individually-named Board Members.[16]

### C.  Counts II, III, and V

Defendants group Counts II, III, and V of the Amended Complaint together and characterize them as contract claims asserting violations of the CBA.  Specifically, Defendants argue that these claims center on Smith's "perceived rights to select which courses she will teach, to speak with union stewards, and to exercise 'just cause' protections."  (Doc. 10 at 3.)  Defendants argue that

---

[16]Count IV was not asserted against Lakeland or the Board.  It is, therefore, dismissed in its entirety.

these claims should have been presented to final and binding arbitration under the CBA, and that her failure to so present them deprives this Court of subject matter jurisdiction under Rule 12(b)(1).  In the alternative, Defendants seek dismissal of Counts II, III, and V under Rule 12(b)(6) on grounds that they "offer no new allegations of discrimination, but simply incorporate the allegations of race discrimination from Count I."  (*Id*. at 8.)  Defendants claim that, "[t]o the extent that Plaintiffs attempt to recast Counts II, III and V as claims of race discrimination, those claims would be duplicative of the Title VII claim in Count I."  (*Id*. at 11.)

Smith has not objected to Defendants' construction of these causes of action, and, indeed, in her responsive briefing, Smith agrees that Counts II, III, and V are "contractual claims."  (Doc. 13 at 6) (stating that the CBA "affords [Plaintiffs] the right to litigate the contractual claims stated in Counts II, III and V before this court").  Smith contends, however, that the language in the CBA does not require arbitration of her claims and that she is free to assert them here.  Specifically, Smith argues that "the parties to the CBA between Defendant College and the LFA did not foreclose employees from pursuing their claims in other forums as do most agreements."  (Doc. 13 at 5.)

Under Ohio law,

> An agreement between a public employer and an exclusive representative entered into pursuant to this chapter governs the wages, hours, and terms and conditions of public employment covered by the agreement.  If the agreement provides for a final and binding arbitration of grievances, public employers, employees, and employee organizations are subject solely to that grievance procedure.

O.R.C. § 4117.10(A).  Therefore, when a collective bargaining agreement provides for binding arbitration of grievances relating to "wages, hours, and terms and conditions" of employment, binding arbitration is the <u>exclusive</u> remedy for "violations of employees' employment rights arising from the collective bargaining agreement."  *See Brannen v. Bd. of Educ*., 761 N.E.2d 84, 90 (Ohio Ct. App. 2001); *State ex rel. Wilkinson v. Reed,* 789 N.E.2d 203, 209 (Ohio 2003) (finding that the

23

trial court lacked jurisdiction to consider the claim for breach of the collective bargaining agreement, where that agreement provided for final and binding arbitration of grievances); *Cotton*, 2009 U.S. Dist. LEXIS 49569 at *20-21 (citing *Antram v. Upper Scioto Valley Local Sch. Dist. Bd. of Educ.*, 2008-Ohio-5824, 2008 Ohio App. LEXIS 4892, ¶ 8 (Ohio Ct. App. Nov. 10, 2008)).

The existence of a collective bargaining agreement does not prevent an employee from filing and prosecuting claims under federal or state statutes. *See Unroe v. Bd. of Educ. Rock Hill Local Sch. Dist.*, No. 1:04-CV-00181, 2006 U.S. Dist. LEXIS 602, *48-50 (S.D. Ohio Jan. 4, 2006) (citing *Gilmer v. Interstate Johnson/Lane Corp.*, 500 U.S. 20, 27 (1991) ("The Gilmer Court noted that rights asserted pursuant to statutes are independent of any arbitration process."). While an employee's contractual rights under the collective bargaining agreement are subject solely to the grievance procedure contained therein, "his statutory rights are not." *Haynes v. Ohio Turnpike Comm.*, 893 N.E.2d 850, 853 (Ohio Ct. App. 2008). In *Haynes*, the court indicated that the plaintiff's statutory rights under O.R.C. § 4112 are "distinct from any right conferred from the collective bargaining agreement and are therefore independent of the arbitration process." *Id.* (internal citations omitted). Accordingly, the court found that the plaintiff was not required to exhaust his administrative remedies prior to filing his lawsuit based on age discrimination. *Id.* at 854.

A collective bargaining agreement can, however, contain an agreement to arbitrate statutory claims. Any such agreement "must be 'clear and unmistakable.'" *Haynes,* 893 N.E.2d at 853 (finding that, although the collective bargaining agreement at issue mentioned that the employer could not discriminate based on age, it did not contain "a clear and unmistakable agreement to arbitrate statutory claims"); *see also Minnick v. City of Middleburg Heights,* 2003 Ohio 5068, 2003 Ohio App. LEXIS 4569, ¶ 23 (Ohio Ct. App. 2003) ("We recognize that statutory claims can be

24

made the exclusive subject of arbitration agreements where an individual waives his or her right to a judicial forum and agrees to arbitrate such statutory claims."). Stated differently, although a collective bargaining agreement can waive an employee's statutory rights, such a waiver must be "clear and unmistakable."[17]

It is undisputed that Smith was a member of the LFA and, as such, she was bound by the terms of the CBA. The CBA contains a multi-stage Grievance Procedure which culminates in final and binding arbitration. This procedure must be followed when an employee claims that "there has been a violation, misinterpretation, or misapplication of an express provision of [the CBA] or that it has not been equitably applied to the detriment of the grievant." (Doc. 1-2 at 2 (Article II § A(1))). The CBA expressly provides that "[e]xhaustion of this grievance procedure is required as to all disputes within its scope." (Doc. 1-2 at 5 (Article II § C(6)). Therefore, to the extent Smith intends Counts II, III, and V to allege that Defendants violated her rights under the CBA, binding arbitration is her exclusive remedy under O.R.C. § 4117.10, and the Court has no jurisdiction over those claims. *See Brannen*, 761 N.E.2d at 90 (finding that, because the collective bargaining agreement provides for binding arbitration of grievances, binding arbitration is the exclusive remedy for any claim that defendants violated plaintiffs' rights under that agreement).

Smith does not address the application of O.R.C. § 4117.10, and fails to provide any contrary law. Instead, she argues that other provisions in the CBA permit her to pursue her claims in this forum. (Doc. 13 at 5.) Specifically, Smith cites to a provision in the Grievance Procedure which states that "[n]othing contained herein shall deny to any individual or the College its rights under

---

[17]In a recent 2009 decision, the Supreme Court found that "a collective-bargaining agreement that clearly and unmistakably requires union members to arbitrate ADEA claims is enforceable as a matter of federal law." *14 Penn Plaza LLC v. Pyett*, 129 S.Ct. 1456, 1474, 173 L.Ed.2d 398, 420 (2009).

state or federal constitutions or law." (Doc. 13 at 5) (citing Doc. 1-2 at 4.) Smith latches onto this provision and argues that she can litigate her contractual claims in this Court. (*Id*. at 6.) Under O.R.C. § 4117.10(A), however, the grievance procedure set forth in the CBA is her exclusive remedy for any breach of contract claims.

Nowhere in the portions of the CBA submitted to the Court does it state that an employee waives his or her statutory right to pursue discrimination claims in court or that he or she agrees to submit statutory claims to arbitration. Instead, the CBA contains a generic nondiscrimination clause[18] which specifically states that "[n]othing in this section is intended to prohibit an employee from seeking appropriate legal relief." (Doc. 1-2 at 19.) The Court finds, therefore, that Smith was not required to exhaust CBA remedies prior to filing suit for violation of Title VII, § 1981, and O.R.C. § 4112.02.

The Court must determine whether Counts II, III, and V assert statutory or contractual rights. Although Smith apparently concedes in her briefing (albeit without any analysis) that these are contract claims, the Court must consider the claims as they are alleged in the Amended Complaint. If Counts II, III, and V assert contractual rights under the CBA, then they are subject to the Grievance Procedure contained therein, and this Court does not have jurisdiction to hear the claims. If, however, they claims assert violations of rights which arise independently from the CBA, then the Court does have jurisdiction over them. *See Haynes*, 893 N.E.2d at 854 (finding that plaintiff's "statutory claims are distinct from his collective bargaining agreement rights; therefore, they are 'independent of the arbitration process'" and plaintiff was "not required to exhaust his administrative

---

[18]Article IX, Section C provides that "[t]he Board will not discriminate against any employee in any manner because of employee's race, color, creed, religion, national origin, age, handicap, marital status, sex, sexual orientation, or political belief or association." (Doc. 1-2 at 19.)

remedies" before filing suit).

### 1.        Racial Discrimination Under 42 U.S.C. § 1981 (Count II)

In Count II of the Amended Complaint, Smith alleges that the terms and conditions of her employment were governed by the CBA and that she was discriminated against on the basis of race in violation of § 1981.  In particular, Smith alleges that she was denied the right "to make and enforce contracts . . . as is enjoyed by Defendant College's White faculty members and the benefits, privileges, terms, and conditions of the contractual relationship under the CBA."  (Doc. 3 at ¶ 82.)

Section 1981 prohibits intentional race discrimination in the making and enforcing of contracts involving public and private actors.  *Christian v. Wal-Mart Stores, Inc.*, 252 F.3d 862, 867-68 (6th Cir. 2001).  Specifically, § 1981(a) provides that:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a).  "Make and enforce contracts" is defined to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  42 U.S.C. § 1981(b).  Claims under § 1981 are examined under the same framework as Title VII claims.  *Christian*, 252 F.3d at 868.

In Count I of the Amended Complaint, Smith alleges racial discrimination and cites to Title VII, 42 U.S.C. § 1981, and O.R.C. § 4112.02.  Count II also appears to allege racial discrimination in violation of § 1981.  In both Counts, Smith alleges that she was subjected to: (1) unlawful discrimination based on race; and (2) different terms and conditions than white faculty members in Lakeland's English Department.  (Doc. 3 at ¶¶ 74-76, 79-83.)

27

Although they are analyzed under the same framework, § 1981 and Title VII give rise to separate and distinct causes of action. Indeed, the Supreme Court has held that the "remedies available under Title VII and under § 1981, although related, and although directed to most of the same ends, are separate, distinct, and independent." *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 128 S.Ct. 1951, 1960 (2008) (quoting *Johnson v. Railway Express Agency, Inc*., 421 U.S. 454, 461 (1975)). While it is appropriate to assert claims under both Title VII and § 1981, it is axiomatic that Smith cannot assert two separate counts alleging the exact same claims. *See Mohr v. Chicago Sch. Reform Bd. of Trustees of the Bd. of Educ*., 993 F.Supp. 1155, 1157 (N.D. Ill. 1998) (considering whether the plaintiff alleged duplicative § 1981 claims and stating that she "cannot bring two counts alleging the same claims against the Board"). Therefore, to the extent Smith's § 1981 claim alleged in Count II is a claim for racial discrimination under the statute, it is duplicative of Count I, and will be dismissed as redundant.

Claims under § 1981 are separate and independent from any claims an employee has under the terms of a collective bargaining agreement. In her responsive briefing, however, Smith characterizes Count II as a contract claim. In light of the apparent inconsistency between the allegations in the Amended Complaint and Smith's responsive briefing, Smith shall have **fourteen (14) days** from the date of this Order to amend her Amended Complaint to either: (1) clarify that the claim asserted in Count II is somehow distinct from that asserted in Count I; or (2) remove the redundancy of claims by omitting reference to § 1981 in Count I and proceed with Count II as her claim for racial discrimination under § 1981.

To the extent Count II is a contractual claim stemming solely from Smith's rights under the CBA, it is dismissed because the CBA provides for a final and binding arbitration of grievances. *See*

28

O.R.C. § 4117.10(A); *see Brannen*, 761 N.E.2d at 90 (finding that, because the collective bargaining

agreement provides for binding arbitration of grievances, binding arbitration is the exclusive remedy

for any claim that defendants violated plaintiffs' rights under that agreement).

### 2.    Retaliation Under O.R.C. § 4112.02 (Count III)

Count III of the Amended Complaint appears to assert a claim for retaliation in violation of

O.R.C. § 4112.02.  In support of this claim, Smith alleges that she contacted her LFA officials to

discuss her rights under the CBA to select the courses of her choice.  (Doc. 3 at ¶ 85.)  According

to Smith, Defendant Killeen knew that she reached out to the LFA and, as a result, Killeen

recommended the nonrenewal of her probationary contract.  (*Id.* at ¶ 88.)

Defendants seek dismissal of Count III on the basis that it focuses on Smith's alleged right

to speak with union officials.  (Doc. 10 at 3, 10.)  According to Defendants, because Count III

contains allegations relating to Smith's union activity, it is governed by the CBA and is subject to

the CBA's Grievance Procedure.  In the alternative, Defendants seek to dismiss Count III under Rule

12(b)(6) on grounds that it simply incorporates the allegations of race discrimination from Count I.

O.R.C. § 4112.02(I) makes it unlawful:

> [f]or any person to discriminate in any manner against any other person because that
> person has opposed any unlawful discriminatory practice defined in this section or
> because that person has made a charge, testified, assisted, or participated in any
> manner in any investigation, proceeding, or hearing under sections 4112.02 to
> 4112.07 of the Revised Code.

The elements required to establish retaliation under O.R.C. § 4112.02 are identical to those required

to establish such a claim under Title VII. *Dalton v. Jefferson Smurfit Corp.*, 979 F.Supp. 1187, 1200

(S.D. Ohio 1997).  To establish a claim for retaliation, a plaintiff must show that: (1) she engaged

in protected activity; (2) her employer knew she participated in the activity; (3) she suffered an

adverse employment action; and (4) there is a causal connection between the protected activity and

the adverse action.  *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 578 (6th Cir. 2000) (citations

omitted).  A plaintiff can "easily" establish a *prima facie* case of retaliation.  *Miller v. City of

Canton*, 319 Fed. Appx. 411, 421 (6th Cir. 2009) (citing *McClain v. North West Cmty. Corr. Ctr.

Judicial Corr. Bd.*, 440 F.3d 320, 335 (6th Cir. 2006)).

As previously indicated, case law applicable to Title VII is generally applicable to claims

under O.R.C. § 4112.02.  Under Title VII, examples of protected activity include "complaining to

anyone (management, unions, other employees, or newspapers) about allegedly unlawful practices."

*Johnson*, 215 F.3d at 579.  An employees' complaints to an employer, supervisor, or union

representative constitute protected activity only if they relate to unlawful discrimination.  *See

Culpepper v. Hospice of South Texas, Inc.*, No. V-06-33, 2008 U.S. Dist. LEXIS 9829, *15 (S.D.

Tex. Feb. 11, 2008) ("An employee's complaints to an employer do not constitute protected activity

unless the complaints clearly relate to unlawful employment discrimination."); *see also Motley v.

Ohio Civ. Rights Comm*., 2008 Ohio 2306, 2008 Ohio App. LEXIS 1958, ¶ 15 (Ohio Ct. App. May

13, 2008) ("Federal courts have concluded that the filing of a union grievance that does not raise

Title VII issues (e.g. discrimination) does not constitute 'protected activity'."); *Ford v. Consol.

Edison Co. of NY, Inc*., No. 03 Civ. 9587, 2006 U.S. Dist. LEXIS 8599, *59 (S.D.N.Y. Mar. 6, 2006)

("If Plaintiff had complained to his supervisors about race discrimination in the workplace, these

complaints would be protected.  Defendant could not retaliate against Plaintiff for making such

complaints.").  The behavior complained of must be something "the employee reasonably believes

to be discriminatory, 'whether or not the challenged practice ultimately is found to be unlawful.'"

*Miller v. City of Canton*, 319 Fed. Appx. 411, 420 (6th Cir. 2009) (quoting *Johnson*, 215 F.3d at

579-80)).

Although it is not entirely clear, it seems that Smith is asserting that she engaged in protected

30

activity when she complained to LFA officials.  In the Amended Complaint, Smith alleges that she: (1) "engaged in the protected activity of contacting LFA officials . . . regarding the issue of her right and privilege to select the courses of her choice because as an African American she wanted to be treated like Defendant College's White English Department faculty members;" and (2) Defendant Killeen recommended nonrenewal of her probationary contract "in retaliation for her having engaged in the protected activity of consulting LFA officials."  (Doc. 3 at ¶¶ 88-89.)  Smith does not specifically address whether consulting with a union representative regarding the terms of a collective bargaining agreement constitutes the type of protected activity contemplated by O.R.C. § 4112.02.

Although Smith alleges that she consulted with LFA officials regarding her rights under the CBA, it is not clear whether she complained to those officials about *alleged racial discrimination*. As a result, it is also unclear whether Smith can assert a retaliation claim under O.R.C. § 4112.02. Given the stage in the proceedings, and in an abundance of caution, the Court grants Smith **fourteen (14) days** from the date of this Order to amend Count III to clarify whether she engaged in protected activity that could give rise to a cognizable retaliation claim under O.R.C. § 4112.02.

As was the case with Count II, however, if, as she alleges in her responsive briefing, Smith intends Count III as a contract claim alleging violation of the CBA, then it must be dismissed for lack of jurisdiction because it was not submitted to final and binding arbitration under the CBA.  *See* O.R.C. § 4117.10(A); *see also Brannen*, 761 N.E.2d at 90 (finding that, because the collective bargaining agreement provides for binding arbitration of grievances, binding arbitration is the exclusive remedy for any claim that defendants violated plaintiffs' rights under that agreement).

31

### 3.        Wrongful Termination (Count V)

In Count V, Smith alleges that: (1) she complied with her obligations under the CBA and her probationary contract; and (2) Defendants' decision not to renew her contract was without "just cause," and amounted to wrongful termination.  (Doc. 3 at ¶¶ 99-102.)[19]  Smith does not cite to any statutory provision(s) in support of this claim, and does not allege wrongful discharge in violation of public policy.[20]  The parties appear to agree that Count V is a straight-forward breach of contract

---

[19]Throughout the Amended Complaint, Smith alleges that her employment with Lakeland was subject to a probationary contract.  While Smith alleges in Count V that she complied with the terms of her probationary contract, she later alleges that the non-renewal of her "non-probationary contract . . . amounted to the wrongful termination of her employment for Defendant College."  (Doc. 3 at ¶ 102.)  It is unclear why Smith refers to her contract as "non-probationary" with respect to this claim.  Pursuant to the terms of the CBA, moreover, "[a]ll new faculty members shall be awarded a probationary contract upon their employment by the College."  (Doc. 1-2 at 15.)  The CBA further provides that, "[a]fter a faculty member has served for four (4) academic years at the College, he/she shall be eligible to apply for a continuing contract with tenure."  (*Id*. at 16.)  The facts alleged in the Amended Complaint reveal that Smith was employed by Lakeland for three (3) academic years (2006-2007, 2007-2008, and 2008-2009).

[20]Ohio law recognizes a common law tort claim for wrongful discharge in violation of public policy.  *Greeley v. Miami Valley Maintenance Contrs., Inc*., 551 N.E.2d 981 (Ohio 1990).  To establish this claim, a plaintiff must show that: (1) a "clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the *clarity* element);" (2) "dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the *jeopardy* element); (3) the "plaintiff's dismissal was motivated by conduct related to the public policy (the *causation* element);" and (4) the "employer lacked overriding legitimate business justification for the dismissal (the *overriding justification* element)."  *See Lawrence v. Dixon Ticonderoga Co.*, 305 F.Supp.2d 806, 811 (N.D. Ohio 2004) (citing *Himmel v. Ford Motor Co.*, 342 F.3d 593, 598 (6th Cir. 2003)).

Here, Smith does not characterize Count V as a claim for wrongful discharge in violation of public policy.  Even if she did, that claim would fail because under Ohio law, "if existing law already provides remedies sufficient to vindicate the public policy at issue, a plaintiff may not maintain a common law wrongful discharge claim."  *Stewart v. Lucas Co. Juvenile Court*, No. 3:08cv1603, 2010 U.S. Dist. LEXIS 86534, *11 (N.D. Ohio May 6, 2010) (citations omitted); *see also Leininger v. Pioneer Nat'l Latex*, 875 N.E.2d 36, 42 (Ohio 2007) ("It is clear that when a statutory scheme contains a full array of remedies, the underlying public policy will not be jeopardized if a common-law claim for wrongful discharge is not recognized based on that

claim that relies solely on the terms of the CBA.

Although Smith filed a grievance regarding her nonrenewal, there are no allegations that her claims were appealed to an arbitrator under the final step of the Grievance Procedure.[21]  Because her breach of contract claim was never arbitrated, Smith has failed to exhaust the exclusive administrative remedy provided in the CBA.  *See Carter*, 2009 U.S. Dist. LEXIS 16436 at *30-31 (finding that, because the plaintiff's breach of contract claim was never appealed to an arbitrator as required under the collective bargaining agreement's grievance procedure, the court lacked subject mater jurisdiction to consider the claim).  Accordingly, this Court lacks subject matter jurisdiction over Smith's breach of contract claim.  Count V is, therefore, **DISMISSED**.

### D.  Defamation (Count VI)

In Count VI of the Amended Complaint, Smith seeks to hold Defendants Beverage and Lakeland/Board liable for defamation.  Defendants move to dismiss this claim under Rule 12(b)(6) on grounds that it "fails to plead sufficient factual allegations to rise to the level of a plausible claim."  (Doc. 10 at 11.)  In response, Smith simply states that she is "reviewing [her] defamation claim to determine whether to seek leave of Court to amend."  (Doc. 13 at 6.)

Under Ohio law, a plaintiff alleging defamation, whether libel or slander, must show that "a defendant published defamatory and actionable statements to a third party who understood the defamatory nature of the publication."  *Hout v. City of Mansfield*, 550 F.Supp.2d 701, 747 (N.D.

---

policy.").  Courts have found that Title VII and O.R.C. § 4112.02 provide adequate statutory remedies to protect the public against discrimination.  *Stewart*, 2010 U.S. Dist. LEXIS 86534, at *11-12.  As such, Smith cannot maintain an Ohio common law claim for wrongful discharge in violation of public policy.

[21]Smith did, however, file an unfair labor practice charge with the SERB.  The SERB has exclusive jurisdiction to resolve unfair labor practices.  *State ex rel. Ohio Dep't of Mental Health v. Nadel*, 786 N.E.2d 49, 54 (Ohio 2003).

Ohio 2008) (citing *Cooper v. Grace Baptist Church of Columbus, Ohio, Inc.*, 612 N.E.2d 357, 362 (Ohio Ct. App. 1992)).  The elements of a defamation claim include: (1) a false and defamatory statement; (2) unprivileged publication to a third party; (3) "fault amounting at least to negligence on the part of the publisher;" and (4) actionability or special harm caused by the statement.  *Harris v. Bornhorst*, 513 F.3d 503, 522 (6th Cir. 2008) (quoting *Akron-Canton Waste Oil v. Safety-Kleen Oil Servs.*, 611 N.E.2d 955, 962 (Ohio Ct. App. 1992)).

Statements of opinion "are protected under the Ohio Constitution and therefore cannot constitute defamation under state law."  *Harris*, 513 F.3d at 522 (citing *Vail v. Plain Dealer Publ'g Co.*, 649 N.E.2d 182, 185 (Ohio 1995), *cert. denied*, 516 U.S. 1043 (1996)).  To determine whether a statement is an expression of opinion, Ohio courts apply a totality of the circumstances test and consider "the specific language used, whether the statement is verifiable, the general context of the statement, and finally, the broader context in which the statement appeared."  *Id*.

In the Amended Complaint, Smith alleges that: (1) Defendant Beverage and Defendant Lakeland/Board "have made statements and/or permitted its agents and/or representatives to publish written statements on their behalf describing [Smith] as 'defiant;'" and (2) this description of Smith as "defiant" has damaged her professional reputation "and is, therefore, libelous, per se."  (Doc. 3 at ¶¶ 105-106.)  Defendants argue that Smith fails to state a claim for defamation because she provides no details regarding the statement at issue.  For example, it is unclear who specifically made the statement, to whom it was made and when, and there is no context for the alleged publication of the statement.  (Doc. 10 at 13.)

Other than making the general assertion that Defendants called her "defiant," Smith fails to provide any allegations supporting her defamation claim.  This statement, standing alone, does not give rise to a plausible defamation claim.  As Defendants correctly note, there are no allegations

34

regarding to whom the alleged defamatory statement was made or the context in which it was allegedly made.[22]  Tellingly, Smith has not sought to amend Count VI.  The Court must assume, therefore, that she has either abandoned this claim or that she cannot readily remedy the deficiencies in it.  Accordingly, Count VI is hereby **DISMISSED**.

### E.   Loss of Consortium (Count VII)

The final claim asserted in the Amended Complaint is for loss of consortium on behalf of Jeffrey Smith.  Defendants argue, and Smith does not dispute, that such a claim must be predicated on a tort involving bodily injury.  In her responsive briefing, Smith merely states that Plaintiffs "are reviewing their loss of consortium claim to determine whether it should be dismissed."  (Doc. 13 at 6.)

It is well-established that a "claim for loss of consortium is derivative in that the claim is dependent upon the defendant[] having committed a legally cognizable tort upon the spouse who suffers *bodily injury*."  *Campbell v. PMI Food Equipment Group, Inc.*, 509 F.3d 776, 790-91 (6th Cir. 2007) (citing *Bowen v. Kil-Kare, Inc.*, 585 N.E.2d 384, 392 (Ohio 1992)).  Ohio courts have consistently held that "bodily injury" does not include nonphysical harm.  *Id.* at 791.

Here, Jeffrey Smith bases his claim for loss of consortium on Defendants' alleged wrongful termination of his wife.  Because Smith does not allege that she sustained any bodily injury, her husband, Jeffrey Smith, has not, and cannot, state a claim for loss of consortium.  Accordingly,

---

[22]As Defendants correctly point out, there are no allegations in the Amended Complaint from which Defendants could assess whether "they are entitled to a qualified immunity or privilege regarding the publication of the alleged statement."  (Doc. 10 at 13 n.6.)  Under Ohio law, "the doctrine of qualified privilege provides that statements made in good faith on a matter of common interest between and employer and an employee, or between two employees, concerning a third employee are protected in an action for defamation."  *Quintile v. Medina Co.*, No. 1:07cv2413, 2008 U.S. Dist. LEXIS 47556, *23 (N.D. Ohio June 17, 2008) (citing *Evely v. Carlon* Co., 447 N.E.2d 1290, 1292 (Ohio 1983)).

Count VII is **DISMISSED**.

IV.    <u>**CONCLUSION**</u>

For the foregoing reasons, Defendants' Partial Motion to Dismiss the Amended Complaint under Rules 12(b)(1) and 12(b)(6) (Doc. 10) is **GRANTED in part and DENIED in part**. The following claims are <u>**DISMISSED**</u> with prejudice:

(1)    Smith's Title VII claims against the individually-named Board Members and Lakeland Employees in their individual capacities (Count I);

(2)    Smith's racial discrimination claims under 42 U.S.C. § 1981 and O.R.C. § 4112.02 against the individually-named Board Members (Count I);

(3)    Smith's sex discrimination claim (Count IV);

(4)    Smith's wrongful termination claim (Count V);

(5)    Smith's defamation claim (Count VI); and

(6)    Plaintiff Jeffrey Smith's loss of consortium claim (Count VII).

The following claims **remain pending**:[23]

(1)    Smith's Title VII claims against Lakeland, the Board, and Defendants Beverage, Law, Killeen, and Soto-Schwartz in their official capacities (Count I); and

(2)    Smith's racial discrimination claims under 42 U.S.C. § 1981 and O.R.C. § 4112.02 against Lakeland, the Board, and Defendants Beverage, Law, Killeen, and Soto-Schwartz (Count I).

Smith shall have **fourteen (14) days** from the date of this Order to amend Count II (racial discrimination under 42 U.S.C. § 1981) and Count III (retaliation under O.R.C. § 4112.02) to clarify the bases for these claims consistent with this Order.  If Smith cannot, in good faith, amend these claims, they will be dismissed.

---

[23]The Court takes no position on Smith's likelihood of success on her remaining claims.

**IT IS SO ORDERED.**

s/Kathleen M. O'Malley
**KATHLEEN McDONALD O'MALLEY**
**UNITED STATES DISTRICT JUDGE**

**Dated: September 28, 2010**