UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION


| | | |
|---|---|---|
| **ROZELLE COCKERHAM** | : | **Case No. 4:09-CV-2015** |
| **Plaintiff,** | : | |
| | : | **JUDGE KATHLEEN O'MALLEY** |
| **v.** | : | |
| **MICHAEL J. ASTRUE,** | : | **MEMORANDUM & ORDER** |
| **Commissioner of Social Security,** | : | |
| **Defendant.** | : | |


This is an action for judicial review of the final administrative decision of the Commissioner of

Social Security ("Commissioner") denying the application of Plaintiff, Rozelle Cockerham, for Disability

Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423.  Cockerham

brought this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the administrative decision

of the Commissioner of Social Security.  The Court, having reviewed the record, the Plaintiff's brief (Doc.

10) and the Commissioner's brief (Doc. 15), will **AFFIRM** the Commissioner's decision, as it is supported

by substantial evidence.

I.    **BACKGROUND**

    A.    **Factual Background**

        Cockerham was born on February 26, 1960, and he was thirty-nine (39) years old as of his alleged

disability onset date, September 30, 1999.  Cockerham has an eleventh grade high school education and past

relevant work experience as a construction laborer.  Other than sporadically, to the extent noted below, he has not engaged in substantial gainful activity since September 30, 1999.

On September 30, 1999, Cockerham sustained a work-related injury when a piece of heavy construction machinery drove over his right leg.  (Tr. 124).  Cockerham was diagnosed with a right ankle fracture and he was cast for a period of six weeks followed by a six week period in a walking boot.  (Tr. 367).

As a result the injury he sustained to his right ankle, Mr. Cockerham was treated at Forum Health Rehabilitation Services beginning in December 1999. (Tr. 127-373).  On December 29, 1999, Cockerham's physical therapist Michael Schattinger conducted an initial physical residual functional capacity evaluation.  (Tr. 367-71).  He noted that Cockerham had difficulty performing all activities of daily living due to his injury.  (Tr. 368).  He found that Cockerham had a decreased range of motion, strength, balance, stability, and proprioception in the right lower extremity.  (Tr 369-70).  Upon competition of his physical therapy on February 11, 2000, Mr. Schattinger concluded that Cockerham could safely return to his work activities without restrictions.  (Tr. 989).  Accordingly, Cockerham returned to work for several months.  (Tr. 167).

After a few months at work, Cockerham ceased his duties because of right ankle pain and swelling.  (Tr. 287).  In light of the pain and swelling in his right ankle, Cockerham underwent an ankle arthroscopy.  (Tr. 167-77, 964-65).  From June to August 2000, Cockerham again attended physical therapy with Mr. Schattinger.  (Tr. 293-95).  At the end of his physical therapy, Mr. Schattinger again found that Cockerham could safely resume his regular work activities.  (Tr. 295).  Cockerham once more returned.  (Tr 287).

Cockerham stopped working again, however, after experiencing pain and swelling in his right ankle.  *Id.*  In November 2000, Cockerham was referred to Dr. Kay, his treating orthopaedic surgeon.  *Id.*  Dr. Kay found that Cockerham had a right ankle fracture with soft tissue injury.  (Tr. 125).  In light of Cockerham's

-2-

ongoing complaints, Dr. Kay recommended and performed a second ankle arthroscopy on April 12, 2001. (Tr. 1049). After performing this surgery, Dr. Kay determined that Cockerham would benefit from an ankle fusion.  On September 25, 2001, Dr. Kay fused Cockerham's right ankle.

In December 2001, examiner Dr. Raghavan saw Cockerham at the request of the Ohio Bureau of Worker's Compensation.  (Tr. 905).  He noted that, while Cockerham used crutches and wore a brace full time on his right ankle, he was capable of taking care of his personal needs without difficulty.  (Tr. 906). Dr. Raghavan concluded that, at that time, Cockerham could not perform his duties as a construction laborer. (Tr. 907).

After Dr. Raghavan's examination, Cockerham returned to physical therapy with Mr. Schattinger. (Tr. 274-291).  On March 21, 2002, Cockerham completed his physical therapy.  (Tr. 274).  At the completion of his therapy, Mr. Schattinger noted that Cockerham had shown minimal overall progress towards achieving the goals of the therapy.  (Tr. 276).  He concluded that "Mr. Cockerham is not an appropriate candidate for construction labor given the HEAVY physical demands of this work . . . I believe that it would be in his best interest to pursue vocational retraining to pursue a position that is within his physical capabilities." *Id.*

After completing his physical therapy, Dr. Sterle examined Cockerham at the request of the Ohio Bureau of Worker's Compensation.  (Tr. 901-04).  During the examination on July 22, 2002, Dr. Sterle found that Cockerham did not use a cane and walked slowly with a mild limp.  (Tr. 903).  Dr. Sterle concluded that Cockerham could not return to his previous work as a construction laborer, but that he could return to work that did not involve prolonged walking, standing or climbing  steps.  (Tr. 904).

Over the next several months Cockerham continued to suffer from ankle pain and swelling.  (Tr. 675-678).  As a result of his continued pain, in September 2002, Dr. Kay gave Cockerham pain injections.  (Tr.

676).  At first, Cockerham experienced pain relief from the injections, but the injections gradually stopped working.  (Tr. 675).  In light of his continued complaints of pain, Dr. Kay decided to perform a fourth surgery on Cockerham's right ankle.  *Id.*

On January 2, 2003, Dr. Kay operated on Cockerham, performing a deep implant removal of the old hardware, a peroneal tendon repair, and a posterior tibial tenosynovectomy.  (Tr. 675).  After the operation, Dr. Kay prescribed crutches and non-weight bearing activity for several weeks.  (Tr. 674).  During his recovery, Cockerham attended physical therapy, but made little progress because of pain complaints.  (Tr. 208-09).

In June 2003, Cockerham underwent a functional capacity evaluation with physical therapist Luann Carfung.  (Tr. 163-66).  During this examination, Cockerham made no mention of ankle pain during twelve minutes of walking on a treadmill.  (Tr. 165).  Ms. Carfung concluded that "Mr. Cockerham has demonstrated the ability to perform MEDIUM/HEAVY levels of physical work.  However, a job that requires significant amounts of balancing and/or climbing to high heights may not be appropriate . . . ." *Id.*

Over the next several months Cockerham continued to see Dr. Kay regarding ankle pain.  (Tr. 671-73).  On October 31, 2003, during an appointment with Dr. Kay, he diagnosed Cockerham with arthritis on the basis of x-rays.  (Tr. 673).  In light of his arthritis, Dr. Kay recommended that Cockerham use a cane and ankle brace.  *Id.*  On June 4, 2004, during another visit with Dr. Kay, he stated that Cockerham has a discrete area of complete loss of articular cartilage, while most of the joint was relatively normal in appearance, there is a very significant area of complete loss of cartilage.  (Tr. 670).  In addition, Cockerham reported that Lidoderm patches had been very helpful in reducing his pain.  *Id.*  Dr. Kay concluded that Cockerham had probably reached maximum medical improvement at this stage of his treatment.  *Id.*

In June 2004 it was noted that Cockerham had been actively seeking employment, e.g., filing fifteen

job applications per week, without success.  (Tr. 146-47).

In an effort to address his chronic pain, Cockerham attended a chronic pain rehabilitation group from January 2005 through February of the same year.  (Tr. 504-07, 561).  The managing psychologist, Dr. Michael Heliman, opined that Cockerham suffered from a lack of understanding of the behavioral, cognitive, and psycho physiological aspects of chronic pain rehabilitation.  (Tr. 561).

In early February 2005, Cockerham went to the St. Joseph Health Center complaining of shortness of breath.  (Tr. 379).  Cockerham indicated that, while he did not have chest pain at that time, he had suffered from chest pain and shortness of breath over the last four to five months.  *Id.*  Cockerham also indicated to the doctor that he had been performing a lot of demolition work, and he had been exposed to dust as a result.  *Id.*  A chest x-ray showed bilateral pulmonary nodules, and a chest CT scan showed partially calcified nodules (Tr. 384, 385).  The reviewing radiologist, Dr. Paul Gould, found the results suggestive of sarcoidosis or metastatic disease, and he recommended a lung biopsy.  (Tr. 386).  Cockerham was diagnosed with dyspnea and prescribed an inhaler.  (Tr. 381).

On February 24, 2005, Cockerham saw Dr. Belany, a pulmonologist, for further evaluation of his breathing issue.  (Tr. 388-92).  Dr. Belany noted that Cockerham was relatively asymptomatic, and while he complained of breathlessness, he denied experiencing chest pain, coughing, or wheezing.  (Tr. 388).  Dr. Belany concluded that Cockerham's symptoms were consistent with pulmonary sarcoidosis.  (Tr. 391).  In light of this fact, he suggested Cockerham lose twenty pounds and prescribed Advair.  *Id.*

At the end of March, 2005, during a follow up visit, Dr. Kay, noted that Cockerham was still having "some pain" in his foot.  (Tr. 1064)  He noted that Cockerham appeared to be suffering from chronic pain. *Id.*  In light of this diagnosis, Dr. Kay prescribed Vicodin, which had worked well in the past.  *Id.*  As a concluding note, Dr. Kay opined that "[a]t this point, I think [Cockerham] would have to be considered

unlikely to ever return to gainful employment and certainly should be considered for permanent and total disability." *Id.*

Cockerham applied for DIB on April 12, 2005, alleging a disability onset date of September 30, 1999.  Mr. Cockerham claims disability on the basis of injury to his right ankle and the pain caused by this injury, pulmonary sarcoidosis, and mental impairment, namely depression.

A few months later, after another follow up visit at Dr. Kay's office, Dr. Kay noted that Cockerham's ankle fusion was in excellent position, that he walked with a cane, and exhibited a slight antalgic gait.  (Tr. 664).  Importantly, at the request of his examining nurse, a receptionist watched Cockerham as he entered the parking lot after his appointment.  *Id.*  The receptionist indicated that Cockerham gingerly stepped into the parking lot and then increased his cadence.  *Id.*

In July 2005, at the request of the Bureau of Disability Determination, Cockerham saw John Brescia for a psychological evaluation. (Tr. 627-35).  Mr. Brescia administered personality testing to Cockerham whose scores were significantly elevated, indicating depression.  (Tr. 633).  Specifically, Mr. Brescia assessed: depressive disorder, personality disorder, and a global assessment functioning ("GAF") score of 50.[1]  He opined that Cockerham: (1) was at least moderately impaired in his ability to relate to others; (2) could understand and follow basic instructions; (3) could maintain the attention to perform simple, repetitive tasks; (4) was at least moderately impaired in his ability to concentrate because of his depression, worry, and preoccupation with difficulties; and (5) was moderately to markedly impaired in his ability to withstand the

---

[1]  The GAF scale is used to report a clinician's judgment of an individual's overall level of functioning.  Clinicians select a specific GAF score within the ten-point range by evaluating whether the individual is functioning at the higher or lower end of the range.  A GAF score of 41-50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep job).  *See American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders*, 33-34 (American Psychiatric Association, 4th ed. text rev. 2000)(DSM-IV-TR).

stress and pressures associated with day-to-day work activity.  (Tr. 634).

Later that month, Dr. Hoyle, a state agency reviewing psychologist, assessed Cockerham's mental residual functional capacity ("RFC").  (Tr. 636-53).  Dr. Hoyle assessed Cockerham's depressive disorder (Tr. 643), pain disorder (Tr. 646), and personality disorder.  (Tr. 647).  Dr. Hoyle stated that Cockerham had mild limitations with activities of daily living, moderate limitations in maintaining social functioning, moderate limitations in maintaining concentration, persistence, or pace, and no episodes of decompensation. (Tr. 650).  She concluded that Cockerham's description of his own symptoms were only partially credible in light of the fact that his depression and anxiety symptoms related to his pain condition that was reported to be significantly improved by February 2005.  (Tr. 638).  As a result of her analysis, she restricted Cockerham to routine work in a non-public setting.  *Id.*   In November 2005, psychologist Dr. Swain affirmed Dr. Hoyle's findings.  (Tr. 638, 640).

On July 20, 2005, Dr. Teague, a state agency reviewing physician, assessed Cockerham's physical RFC.  (Tr. 654-61).  He opined that Cockerham could: (1) occasionally lift/carry twenty pounds and frequently lift/carry ten pounds; (2) stand and/or walk for about six hours in an eight-hour workday; (3) sit for a total of about six hours in an eight-hour workday; and (4) push and/or pull to a limited degree with his lower extremities.  (Tr. 655).  State agency reviewing physician, Dr. Vogel, affirmed Dr. Teague's findings. (Tr. 661).

The next month, Dr. Hawes, an occupational medicine specialist, concluded that Cockerham did not appear to be in acute distress and that his continued pain and discomfort had no obvious or apparent cause. (Tr. 684).  Based on his examination, on both October 7, 2005 and March 15, 2006, Dr. Hawes concluded, as part of a physical capacity evaluation, that Cockerham could perform eight hours of work a day for five days a week.  (Tr. 889, 890).  Dr. Kay certified the conclusion contained in Dr. Hawes' October 2005

-7-

evaluation. (Tr. 890).

Beginning in February 2007 and continuing through February 2008, Cockerham was treated by Dr. Stycho for his ankle injury.  (Tr. 773-80, 782-85, 789, 791-92, 808, 802).  During these examinations, Cockerham continued to complain of ankle pain.  During this period, Cockerham was examined by Dr. Andrew Biestel for the purpose of determining whether Cockerham was permanently and totally disabled. (Tr. 804).  After his examination of Cockerham on September 14, 2007, Dr. Biestel opined that Cockerham was permanently and totally disabled.  (Tr. 806).

With respect to his respiratory issues, on February 19, 2008, Cockerham underwent a lung Biopsy. (Tr. 705).  Dr. Belany confirmed that his biopsy showed that he suffered from sarcoidosis.  (Tr. 691). According to his examination, Dr. Belany concluded that Cockerham suffered a recurrence between 2004 and 2005 and that his disease had progressed since that time.  (Tr. 690-91).  In a RFC completed on December 31, 2008, Dr. Belany concluded that Cockerham could sit for one hour at a time and stand for thirty minutes at a time, for less than two hours per workday.  (Tr. 1021).  He also stated that Cockerham would need unscheduled twenty-to-thirty minute breaks to lie down every one-to-two hours during a workday. *Id.*  Finally, Dr. Belany noted that Cockerham would be absent from work for more than four days per month.  (Tr. 1021).

In January 2009, Cockerham's therapist Mark Bush opined that he had moderate restrictions in activities of daily living, moderate difficulties in maintaining social functioning, and marked difficulties in maintaining concentration, persistence, and pace.  (Tr. 1016).

### B.    Procedural Background

As noted above, Cockerham first filed for DIB on April 12, 2005, alleging a disability onset date of September 30, 1999.  Cockerham's application was denied both initially and on reconsideration.  Thereafter,

Cockerham requested a *de novo* hearing before an ALJ.

### 1.    Administrative Hearing

On February 4, 2009, ALJ James Pileggi conducted a hearing regarding Cockerham's application. (Tr. 28).  Cockerham was represented by counsel during the hearing.  At the hearing, the ALJ heard testimony from Cockerham, his girlfriend, and vocational expert ("V.E.") George Starosta.  (Tr. 1069).

Cockerham testified that he suffers from right ankle pain, and he has difficulty breathing due to his sarcoidosis.  (Tr. 1086, 1091).  With respect to his condition now as compared to three years before the hearing, Cockerham testified that his condition had gotten a lot worse.  (Tr. 1083).  He stated that he took medication to relieve his ankle pain, but that the medicine made him drowsy.  (Tr. 1087).  Regarding his breathing difficulty, Cockerham said he took prednisone to help his breathing.  *Id.*  Cockerham indicated that he could (1) walk for about forty-five minutes; (2) climb about ten stairs before stopping; (3) stand for about thirty minutes before having to sit and rest; and (4) lift ten to twenty pounds.  (Tr. 1082).  In comparison, Cockerham testified that three years before the hearing, he could do "a little something."  (Tr. 1083).

Next, the ALJ questioned the VE.  The ALJ asked the VE to consider a hypothetical individual with Cockerham's vocational characteristics who was limited to sedentary work, required a sit/stand option, and could not (1) be exposed to pulmonary irritants; (2) engage in work that required the operation of foot controls; or (3) climb balance, or squat.  (Tr. 1095).  The VE testified that such a person could perform the following jobs, surveillance system monitor, call out operator, and assembler.  (Tr. 1095).

On cross-examination by Cockerham's counsel, the VE testified that a hypothetical person with the traits described by counsel would not be able to perform work in the national economy.  (Tr. 1100-01).  In addition, the VE testified that a person who could not report for work, or after having reported to work

would have to excuse himself from the workplace on an irregular or random basis three or more times per month could not perform work in the national economy.  (Tr. 1096).

### 2.    ALJ Decision

On March 24, 2009, the ALJ issued a decision finding that Cockerham was not disabled and therefor not entitled to DIB payments.  (Tr. 12).  In accordance with the requisite five-step analysis set forth in 20 C.F.R. § 404.1520, the ALJ reached the following conclusions:

> a.    Cockerham did not engage in substantial gainful activity during the period from his alleged onset date of September 30, 1999, through his date last insured of December 31, 2005;
>
> b.    Through the date last insured, Cockerham had the following severe impairments: status post injury to the right ankle with degenerative joint disease involving right ankle, with history of multiple ankle surgeries, and pulmonary sarcoidosis;
>
> c.    These impairments or combination of impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1;
>
> d.    Cockerham's impairments prevented him from performing his past relevant work as a construction laborer; and
>
> e.    Cockerham had the residual functional capacity ("RFC")[2] to perform

---

[2] An RFC is "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis," which is defined as "8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p("Assessing Residual Functional Capacity in Initial Claims").

"sedentary work . . . however the claimant would have had to be allowed the opportunity to sit or stand at his discretion, and could not have operated foot controls, climbed, balanced, or squatted; he also could not have had exposure to pulmonary irritants . . . ."  Therefore Cockerham could perform a significant number of jobs in the national economy.

(Tr. 17-23).  In light of these findings, the ALJ concluded that Cockerham was not disabled as the term is defined in the Social Security Act.

The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Cockerham's request for review on June 29, 2009.  (Tr. 6-10).

On August 27, 2009, Cockerham filed the instant civil action pursuant to 42 U.S.C. § 405(g) seeking judicial review of the Commissioner's decision.

## II.    STANDARD OF REVIEW

Judicial review of the Commissioner's decision made by an ALJ in a Social Security action is restricted to determining whether the decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Colvin v. Barnhart*, 475 F.3d 727, 729 (6th Cir. 2007).

"Substantial evidence" is evidence that a reasonable mind would accept to support a conclusion.  *See Richardson v. Perales*, 402 U.S. 389, 401 (1971).  This standard requires more than a scintilla of evidence, but less than a preponderance.  *Id.*  When making this determination, a district court must not focus, or base its decision, on a single piece of evidence.  Instead, a court must consider the totality of the evidence on the record.  *See Allen v. Califano*, 613 F.2d 139 (6th Cir.); *Hephner v. Mathews*, 574 F.2d 359 (6th Cir 1978).

To determine whether substantial evidence exists to support the ALJ's decision, a district court does not conduct a *de novo* review, resolve conflicts in the evidence, or make credibility determinations.  Rather,

-11-

a district court must affirm the ALJ's decision, provided it is supported by substantial evidence, even if the court would have decided the case differently.  *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir.1999).  This is true even if there is evidence favoring Plaintiff's side; the ALJ's findings must be affirmed if supported by substantial evidence.  *Listenbee v. Sec'y of Health & Human Servs.*, 846 F.2d 345, 349 (6th Cir.1988).  Accordingly, an ALJ's decision "cannot be overturned if substantial evidence, or even a preponderance of the evidence supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Not withstanding the above, even if an ALJ's decision is supported by substantial evidence, that decision will not be upheld where the ALJ "fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007).

## III.    ANALYSIS

Cockerham raises the following issues for review: First, whether the ALJ erred in determining that Cockerham's depression is a non-severe impairment. Second, whether the ALJ improperly rejected the opinion of Dr. Bellany that Cockerham suffered from sarcoidosis in February 2005. Third, whether the ALJ improperly assessed the plaintiff's right ankle pain.  Fourth, whether the ALJ erred by relying upon the VE's testimony.  (Doc. 10 at 1.)

### A.    The ALJ Did Not Err By Finding that Cockerham's Depression Was a Non-Severe Impairment.

Cockerham argues that the ALJ erred by finding that his depression was a non-severe impairment. (Doc. 10 at 14.)  In step two of the five-step disability analysis, the ALJ must determine whether an

-12-

individual has a "severe medically determinable physical or mental impairment, or combination of impairments that is severe." 20 CFR § 404.1520(a)(4)(iii).  It is well-settled that step two's analysis "serves the goal of administrative efficiency by allowing the Secretary to screen out totally groundless claims." *Farris v. Sec. Health and Human Servs.*, 773 F.2d 85,89 (6th Cir. 1985).  As such, an impairment can be considered as not severe only if the impairment is a slight abnormality, which has such minimal effect on an individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, and work experience.  *Id.* at 90 (quoting *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984)).

The requirement for finding an impairment to be severe is *de minimis* in nature.  An ALJ's failure to find an impairment to be severe, however, is not reversible error, so long as the ALJ determined that the claimant suffered from one or more severe impairments, and the ALJ considered all of the claimant's impairments, even those deemed not severe, in the remaining steps of the disability determination.  *Maziarz v. Sec'y of Health and Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987) ("Since the Secretary properly could consider claimant's cervical condition in determining whether claimant retained sufficient residual functional capacity to allow him to perform substantial gainful activity, the Secretary's failure to find that claimants cervical condition constituted a severe impairment could not constitute reversible error."); *Fisk v. Astrue*, 253 Fed. Appx. 580, 583 (6th Cir. 2007) ("[W]hen an ALJ considers all of a claimant's impairments in the remaining steps of the disability determination, an ALJ's failure to find additional severe impairments at step two 'does not constitute reversible error' ") (quoting *Maziarz*, 837 F.2d at 244).  In such circumstances, moreover, it is unnecessary to decide whether the ALJ erred in classifying the impairment as non-severe.  *Fisk*, 253 Fed. Appx. at 584 (quoting *Maziarz*, 937 F.2d at 244).

Here, the ALJ determined that Cockerham suffered from several severe impairments, namely "status

post injury to the right ankle with degenerative joint disease involving right ankle, with history of multiple ankle surgeries, and pulmonary sarcoidosis." (Tr. 17).  The ALJ then conducted the remaining steps of the sequential evaluation for determining disability, and the ALJ considered limitations and restrictions imposed by all of Cockerham's impairments, including his mental impairments. (Tr. 19-23).  For example, the ALJ noted, while the record reflected a depression diagnosis during the relevant time period, Cockerham did not begin receiving treatment for depression until 2007 and he did not begin taking psycho tropic medication until after his date last insured. (Tr. 17, 20).  In addition, the ALJ discussed the fact that Cockerham was attending church, maintaining adequate social relationships, had a long term girlfriend, was planning on going on vacation, and that he enjoyed fishing. (Tr. 18, 22).  The ALJ, moreover, addressed the conflicting medical assessments of Cockerham's mental impairment, indicated the weight he afforded to each evaluation and the reasons for the respective weight. (Tr. 22).  In light of this analysis, the ALJ concluded that Cockerham would be able to perform the jobs cited by the VE despite his mental impairment. (Tr. 21-22).

The record makes clear that the ALJ properly considered all of Cockerham's impairments when determining whether he retained sufficient residual functional capacity to allow him to perform substantial gainful activity.  Accordingly, the ALJ's failure to find that Cockerham's mental condition was severe, even if wrong, is not reversible error.

**B.      The ALJ Did Not Improperly Reject the Opinion of Cockerham's Treating Pulmonologist.**

Cockerham next argues that the ALJ improperly rejected the opinion of his treating pulmonologist, Dr. Belany.  In 2008, Dr. Belany opined that Cockerham suffered from a recurrence of sarcoidosis in February 2005.  In order to establish entitlement to disability insurance benefits, an individual must establish the he became disabled prior to the expiration of his insured status. 42 U.S.C. § 423(a), (c); *Higgs v. Bowen*,

880 F.2d 860, 862 (6th Cir. 1988).  In making this determination, an ALJ must evaluate every medical opinion they receive, regardless of the source.  20 C.F.R. § 404.1527(d).  The weight given to opinions of medical sources depends upon whether the source is charactered as (1) non-examining; (2) non-treating; or (3) treating.  It is well established that when evaluating medical opinions, the Social Security Administration will generally give more weight to the opinion of a physician or psychologist who examined the claimant than to the opinion of a non-examining source.  20 C.F.R. §§ 404.1527(d)(1); 416.927(d)(1).

Under the "treating physician rule,"an ALJ generally must give greater deference to the opinions of treating physicians than those of other physicians.  *Rogers v. Comm'r of Soc. Sec.*, 386 F.3d 234, 242 (6th Cir. 2007).  A physician or psychologist qualifies as a "treating physician" if there is an "ongoing treatment relationship" and the claimant sees the source "with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the] medical condition."  20 C.F.R. § 404.1502. An ALJ, moreover, must give the opinion of a treating physician controlling weight if it is: (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques;" and (2) "not inconsistent with the other substantial evidence" in the record.  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).  If the opinion of the treating physician is not given controlling weight, the regulations provide that the ALJ "must apply certain factors" in "determining what weight to give the opinion."  *Id.* (emphasis added).  Specifically, the ALJ must consider: (1) the "length of the treatment relationship and the frequency of examination;" (2) the "nature and extent of the treatment relationship;" (3) the "supportability of the opinion;" (4) "consistency of the opinion with the record as a whole;" and (5) "specialization of the treating source." *Id.* (citing 20 C.F.R. § 404.1527(d)(2)).

The regulations specify that the ALJ's decision "will always give good reasons" for the weight given to the treating source's opinion.  20 C.F.R. §§ 404.1527(d)(2); 416.927(d)(2).  The Sixth Circuit has

-15-

characterized this "reasons-giving" requirement as an "important procedural safeguard," which is designed to: (1) assist claimants in understanding why the ALJ deems them not disabled when their treating medical professionals are telling them they are; and (2) "ensure[] that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule." *Wilson*, 378 F.3d at 544 (internal citations omitted).

An ALJ, however, is not bound by a treating physician's conclusory opinion that is unsupported by detailed objective criteria, or when there is substantial medical evidence to the contrary. *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994).

In this case, it is undisputed that Dr. Belany is a treating physician. (Doc. 15 at 12)  In addition, the record indicates that the ALJ determined that Cockerham suffered from the severe impairment of sarcoidosis during his insured status. (Tr. 17).  Cockerham's contention appears to be that the ALJ erred by disregarding Dr. Belany's residual functional capacity questionnaire from December 31, 2008.  Plaintiff states

> [i]n 2008, based on Mr. Cockerham's pulmonary test findings, including those conducted in 2005, Dr. Bellany [sic] completed a residual functional capacity evaluation. Dr. Bellany [sic] opined the Plaintiff was limited to sitting for 1 hour at a time, less than 2 hours per workday, and standing for 30 minutes at a time, less than 2 hours per workday.  The ALJ rejected this opinion claiming that it was made two years after the Plaintiff's date last insured."  (Doc. 10 at 17) (citations omitted).

In making his RFC determination, the ALJ stated "[a]s for any respiratory impairment, the claimant testified that this condition was diagnosed in the year 2005 as sarcoidosis.  While this condition has obviously worsened since, that time, I find no conclusive evidence that it would have precluded the performance of sedentary work with the above-cited nonevertional environmental limitations for the period prior to December 31, 2005."  (Tr. 21).  The ALJ continued, stating "[t]he claimant was evaluated by Dr. Bellany [sic] in February 2005 at which point the physician concluded that he was 'relatively asymptomatic'

-16-

" *Id.*  Furthermore, the ALJ noted that the record indicated that, during Dr. Belany's examination,  "the claimant denied coughing, wheezing, or chest pain,"pulmonary studies revealed only mild respiratory impairment aside from some diminished breath sounds, the examination showed no serious pulmonary complications, and that "Dr. Bellany [sic] actually concluded that the claimant had only a mild airway impairment." *Id.*

With respect to Dr. Belany's 2008 residual functional capacity evaluation, the ALJ stated

> I note a significant gap in the claimant's treatment with this physician from February 2005 until April 2008, at which time he next saw the claimant and placed him on medication such as Prednisone for his respiratory symptoms. The record shows that prior to December 31, 2005, the claimant required no more than minimal treatment and evaluation for his respiratory complaints, and my assessment for sedentary work with the above described non-exertional environmental restrictions accommodates any possible limitations associated with the claimant's respiratory disorder. *Id.*

Accordingly, the ALJ determined, upon the basis of the record as a whole, that Dr. Belany's 2008 residual functional capacity evaluation did not reflect Cockerham's residual functional capacity during Cockerham's period of insured status ending on December 31, 2005.

Substantial evidence in the record supports the ALJ's determination that claimant was not disabled in light of his ability to perform sedentary work during his period of insured status.  While evidence of medical conditions after the termination of a claimant's insured status is relevant to the extent it illuminates the claimant's health before that date, it is not dispositive on the issue of disability during the period of insured status even when made by a treating physician. *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988).

In *Higgs*, claimant asserted that the she was disabled due to hypertension and heart problems during her insured status, which terminated on June 30, 1979. *Id.* at 862.  Mrs. Higgs offered medical evidence of her heart problems from her treating family doctor. *Id.* at 863.  The court found that tests conducted by her doctor during her insured status produced normal results.  In addition, the court noted that subsequent

-17-

testing, conducted after the termination of her insured status, uncovered irregularities with Mrs. Higgs' heart. *Id.* After inspecting these results, however, the court found them to be "minimally probative of Mrs. Higgs' condition in 1979." *Id.* The court held that Mrs. Higgs failed to prove that she suffered from a severe impairment as of the relevant time frame. *Id.* The court reached this conclusion despite the fact that her treating physician opined that she was disabled during her period of impairment because it found that his opinion was not backed by objective findings. *Id.*

As in *Higgs*, Cockerham argues that Dr. Belany's 2008 CFR evaluation established that he was disabled during his period of insured status. This CFR, however, was conducted 3 years after Cockerham's insured status terminated. Although the CFR references test results performed during Cockerham's insured status, including a pulmonary function test and a chest CT, the CFR and the medical records indicate that Cockerham's conditioned worsened, as suggested by the ALJ, in the period after claimant's insured status ended. (Tr. 1019). For example, the CFR indicates that Cockerham's vital capacity was 75-80% in February, 2005, while his capacity dropped to 50-60% in May, 2008 and improved 10% after treatment. *Id.*

In addition, Dr. Belany's report from his February 24, 2005 consultation with claimant indicated that Cockerham "is relatively asymptomatic. He admits to breathlessness, but he is mildly obese. Denies symptoms of coughing, wheezing, chest pain, or hemoptysis." (Tr. 1026). In light of these findings, Dr. Belany prescribed Advair to help address his "mild airway impairment." (Tr. 1029). By contrast, in Dr. Belany's report from his May 29, 2008 follow up with Cockerham, Dr Belany found that Cockerham's vital capacity was around 50%, "suggesting severe pulmonary functional impairment." (Tr. 1036). In light of the difference in Dr. Belany's findings in 2005 and those in 2008, his 2008 opinion with respect to disability does not support the conclusion that Cockerham suffered from disability in 2005 while insured.

As the ALJ pointed out, moreover, other evidence in the record also contradicts the conclusion that

-18-

Cockerham was disabled due to his pulmonary condition during his period of insured status.  For example, when Cockerham was examined in February of 2005 for breathlessness, he reported only occasional shortness of breath and indicated that it had begun only four to five months previously.  (Tr. 379).  Accordingly, there is substantial evidence that supports the ALJ's determination that, at the time Cockerham's insured status ended, his pulmonary condition would not have prevented him sedentary work as described by the ALJ.

### C.    The ALJ Properly Assessed Cockerham's Right Ankle Pain.

Cockerham next alleges that the ALJ improperly assessed his right ankle pain.  (Doc. 10 at 18).  Plaintiff argues that "[r]ather than analyzing Mr. Cockerham's complaints of right ankle pain using the two-pronged [*Duncan*] test, the ALJ merely selected portions of the record which facially supported his ultimate conclusion that the Plaintiff's pain complaints were not credible."  *Id.* at 19.

To establish disability, subjective complaints of disabling pain must be supported by objective medical evidence.  *McCoy v. Chater*, 81 F.3d 44, 47 (6th Cir. 1995) (citing *Casey v. Sec'y of Health and Human Servs.*, 987 F.2d 1230 (6th Cir. 1993); see also 20 C.F.R. § 404.1529.  In determining whether subjective complaints of pain establish disability, lower courts are to use the *Duncan* test and analyze "whether there is objective medical evidence of an underlying medical condition, and if so then, (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or, (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain."  *Jones v. Sec'y Health & Human Servs.*, 945 F.2d 1365, 1369 (6th Cir. 1991) (quoting *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986)).

While it is well-established that *Duncan* describes the proper test for determining disability on the basis of subjective complaints of pain for the purpose of a Disability Insurance Benefits analysis, an ALJ

does not commit error when he analyzes subjective complaints of pain under the standard embodied in 20 C.F.R. § 404.1529.  *Pasco v. Comm'r of Soc. Sec.*, 137 Fed. Appx. 828, 835 (6 th Cir. 2005) ("This Court has previously held that analysis under these regulations [20 C.F.R. §§ 404.1529 and 416.929] is not inconsistent with the standards we set forth in *Duncan*.  We thus agree with other panels of this Court that an ALJ who follows the requirements of 20 C.F.R. § 404.1529 does not commit error by failing to explicitly follow *Duncan*.")

In *Pasco*, the claimant filed for both DIB and SIS.  *Id.* at 832.  After noting that the ALJ did not commit error by applying 20 C.F.R. §§ 404.1529 and 416.929 in his disability analysis, the *Pasco* court analyzed the finding of no disability under the *Duncan* standard.  *Id.* at 835-36.  On the basis of their *Duncan* analysis, the court held that there was substantial evidence supporting the ALJ's finding that the claimant was not disabled.  *Id.*

As in *Pasco*, here, the ALJ specifically noted that he analyzed Plaintiff's symptoms and subjective claims of pain under § 404.1529.  Describing the analysis he conducted pursuant to § 404.1529, the ALJ stated

> In considering claimant's symptoms, I must follow a two-step process in which it must first be determined whether there is an underlying medically determinable physical or mental impairment(s) – i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques – that could reasonably be expected to produce the claimant's pain or other symptoms.  Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, I must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability to do basic work activities.  For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, I must make a finding on the credibility of the statements based on a consideration of the entire case record. (Tr. 19).

Accordingly, to the extent that Cockerham claims that the ALJ failed to analyze his subjective complainants

-20-

of pain under the proper standard, this Court finds that this allegation has no merit.  *Pasco*, 137 Fed. Appx. at 385 ("To the extent that Pasco alleges that the ALJ failed to analyze Pasco's complaints of pain and other physical or mental limitations under *Duncan*, we find that this allegation has no merit. The ALJ specifically noted in his decision that he had evaluated her symptoms, including pain, under the requirements of 20 C.F.R. §§ 404.1529 . . . .").

In light of the above conclusion, the Court will now assess, under the *Duncan* framework, whether the ALJ's findings that Cockerham's right ankle pain was not disabling is supported by substantial evidence.

The ALJ concluded that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment."  (Tr. 20).  Thus, the ALJ concluded, pursuant to *Duncan's* first prong, that there was objective medical evidence of an underlying medical condition.

This finding, moreover, indicates that ALJ concluded that there was not substantial evidence establishing either test under prong two of *Duncan*.  In essence, this statement by the ALJ indicates that he found there was no objective medical evidence in the record that confirmed the severity of the alleged pain, and that, while the objectively established medical condition was of such a severity that it could be reasonably expected to produce the alleged disabling pain, in this case, Cockerham's subjective claims that his medical condition had caused such disabling pain were not credible.

### 1. *Duncan* Analysis: First Test of the Second Prong.

With respect to the first test of *Duncan's* second prong, there is substantial evidence supporting the ALJ's finding that there is insufficient objective medical evidence to confirm the severity of Cockerham's alleged ankle pain.  In reaching this conclusion, the ALJ discussed the claimant's relevant medical history.

-21-

(Tr. 20-21).  The record established that Dr. Raghaven, who examined the claimant in December of 2001 a few months after his ankle fusion, noted that he had slight atrophy of the right leg but that he was independent with his daily routine.  (Tr. 906).  An examination by Dr. Sterle in July 2002 established that Cockerham walked with a mild limp, and that, while he could not return to his former employment, he could return to work with restrictions of no prolonged walking or standing and no climbing of stairs.  (Tr. 903-04).

Dr. Kay, Cockerham's treating orthopedic surgeon, reported in December, 2004 that claimant was walking reasonably well.  (Tr. 667).  In March 2005, Dr. Kay noted that "he is still having some pain in his foot."  (Tr. 666).  The doctor stated that he had what seemed to be chronic pain to the point that he cannot walk without a cane.  *Id.*  In addition, Dr. Kay noted that "I did provide Vicodin HP for him, which has worked out quite well."  *Id.*  As the ALJ pointed out, Dr. Kay also opined in his March 31, 2005 treatment notes that "I think he would have to be considered unlikely to ever return to gainful employment and certainly should be considered permanently and totally disabled."  *Id.*  The ALJ correctly noted that this opinion is inconsistent with Dr. Kay's own medical assessment seven months later, in October, for Worker's Compensation purposes, in which he believed that claimant was capable of at least sedentary work for eight hours a day, five days a week.  (Tr. 890).  In this report, Dr. Kay stated that Cockerham could sit for 8 hours a day, stand for 3 hours a day, and walk for 1 hour a day.  *Id.*  Despite the fact that Dr. Kay is a treating physician, because his March 2005 statement is clearly inconsistent with the October 2005 Worker's Compensation physical capacity report, the ALJ properly disregarded the conclusory statement in the March treatment notes.

Additional evidence in the record also contradicted Dr. Kay's March 2005 opinion.  For example, Dr. Hawes, a physician involved in the claimant's Worker's Compensation claim, completed a physical capacity report on March 15, 2006, several months after Cockerham's insured status expired, that was

-22-

consistent with Dr. Kay's October physical capacity report.  (Tr. 889).  Additionally, Dr Metz who examined

Cockerham, in February 2008, for the purpose of an independent medical examination noted that he

exhibited only a slight limp and was a candidate for sedentary work.  (Tr. 1052).

While there is some objective medical evidence in the record that supports the severity of claimant's

alleged pain, the record properly taken as a whole represents substantial evidence supporting the ALJ's

finding that the objective medical evidence in the record does not support the severity of claimant's alleged

pain.  Accordingly, the ALJ properly found that the first test of the second prong of Duncan was not met.

### 2.  *Duncan* Analysis: Second Test of the Second Prong.

With respect to the second test of *Duncan's* second prong, the ALJ found that, while the objective

medical evidence in the record would support a finding that the medically determinable impairments could

reasonably be expected to cause the alleged symptoms, the record simply did not support the conclusion that

Cockerham actually suffered from disabling pain.  (Tr. 20).

Credibility determinations regarding a claimants subjective complaints, like pain, rest with the ALJ.

*See Siterlet v. Sec'y of Health and Human Servs.*, 823 F.2d 918, 920 (6 th Cir. 1987) (per curiam).  In

addition, "an ALJ's findings based on the credibility of the applicant are to be accorded great weight and

deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and

credibility."

The ALJ stated that, "[a]lthough the claimant clearly has chronic pain complaints involving his right

ankle and obvious limitations associated with the injury and surgeries . . . I do not find his assertions to be

entirely credible and conclude that despite his impairments . . . he retained the ability to perform work with

the confines of my residual functional capacity assessment above."  (Tr. 22-23).  In reaching this

determination with respect to the claimant's subjective complaints of pain, the ALJ noted that both Dr. Kay

and Belany indicated that Vicodin was helping to alleviate Cockerham's pain.  (Tr. 22).  In addition, the ALJ stated "[t]he claimant's credibility with respect to his ankle problem is also weakened by the fact that he appeared to be exaggerating his limitations and pain associated with his ankle joint when he was observed to change his ambulation after leaving the physician's office in July 2005."  (Tr. 22).

Furthermore, the physical capacity reports completed by Dr. Kay and Dr. Hawes, which indicate that claimant is capable of sedentary work, cast doubt on Cockerham's subjective claims that his pain is disabling.

True, the record is replete with claims by Cockerham of severe chronic pain.  However, based on the medical evidence and the ALJ's credibility assessment of the claimant, this court concludes that the ALJ's determination that claimant is not disabled by his pain is supported by substantial evidence.  Based on the paper record, it is hard to imagine that this Court would reach the same conclusion as the ALJ on this point. This Court did not observe Cockerham's demeanor at the hearing, however, and must not substitute its credibility determinations for those of the ALJ.  As noted, moreover, there is substantial evidence in the record to support the ALJ's conclusion on this point, which ends the inquiry on review.

**D.     The ALJ Properly Relied Upon the Testimony of the VE.**

Finally, Cockerham alleges that the ALJ erroneously relied upon the VE's testimony when the ALJ determined that claimant was capable of performing other work that existed in significant numbers in the national economy.  Specifically, plaintiff states "the ALJ failed to address the aggregate effect of the Plaintiff's right ankle pain, depression and sarcoidosis and failed to include any psychological limitations or pain limitations in his hypothetical question [posed to] the vocational expert."  (Doc. 10 at 20).

A vocational expert's testimony is substantial evidence of a claimant's residual functional capacity when the testimony is in response to a hypothetical question that accurately portrays a claimant's physical

-24-

and mental impairments. *Davis v. Sec'y of Health and Human Servs.*, 915 F.2d 777, 779 (6th Cir. 1987).

Such a hypothetical question, however, must only incorporate those limitations the ALJ has accepted as

credible. *Casey v. Sec'y of Health and Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993) ("It is well

established that an ALJ may pose hypothetical questions to a vocational expert and is required to incorporate

those limitations accepted as credible.").

Here, the ALJ posed the following hypothetical question to the VE

> Let's assume we have an individual 48-years of age, 11th grade education,
> work experience that you have defined and described. Let's assume further
> that he's limited to sedentary work but he would not be able to be exposed to
> pulmonary irritants such as dust, smoke, fumes, et cetera. He would not be
> able to engage in work that required the operation of foot controls, he would
> not be able to engage in work that required climbing or balancing, he would
> not be able to engage in cork that required squatting and he would probably
> need a sit/stand option . . . are there other jobs such an individual as I
> described could perform? (Tr. 1095).

This hypothetical's restriction to sedentary work encompasses the effects of Cockerham's right ankle injury

to the extent the ALJ found credible and supported by the record as a whole. In addition, the restriction

relating to exposure to pulmonary irritants accurately accounts for Cockerham's sarcoidosis as supported

by the record. Finally, the ALJ's question takes into account the effects of Cockerham's mental impairment,

again to the extent the ALJ found that impairment to be supported by the record. (Tr. 21-22).

While the claimant's attorney asked the VE a hypothetical based on more restrictive limitations, as

discussed above, there is substantial evidence to support the accuracy of the limitations incorporated in the

ALJ's hypothetical. Accordingly, the ALJ was not required to include the more restrictive limitations in his

hypothetical question, and he did not commit error by failing ask the question proffered by Cockerham's

counsel.

-25-

**IV.** **CONCLUSION**

This case is difficult.  The combination of Cockerham's impairments certainly will make it difficult for him to obtain or maintain employment.  Ultimately, however, the standard of review and recognition of the insured date the ALJ had to employ in his analysis leads the Court to conclude that the Commissioner's decision must be affirmed.  Accordingly, the Court finds that the ALJ complied with all applicable rules and regulations in making and explaining his findings and conclusions, and that the ALJ's decision is supported by substantial evidence. Therefore, the ALJ's decision is **AFFIRMED**.


**IT IS SO ORDERED.**


**s/Kathleen M. O'Malley**
**KATHLEEN McDONALD O'MALLEY**
**UNITED STATES DISTRICT JUDGE**


**Dated: September 28, 2010**

-26-