UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| V. ERIKA SMITH, | Case No. 1:09 CV 2604 |
| Plaintiff, | Judge Dan Aaron Polster |
| vs. | **MEMORANDUM OF OPINION AND ORDER** |
| LAKELAND COMMUNITY COLLEGE, et al., | |
| Defendant. | |

Before the Court is Defendant's Motion for Summary Judgment (**Doc. # 33**) on Plaintiff's race discrimination claims, which are the only claims that remain pending in this case.

**I. BACKGROUND**

Lakeland Community College, which is located in Kirtland, Ohio, hired Erika Smith, an African-American woman, in August 2006 as a full-time English Generalist. Smith's duties included teaching English courses, developing curriculums, providing academic assistance to students, maintaining office hours, and furthering her professional development by attending conferences and working on committees. Her job was designated "full-time tenure track faculty" but was subject to a probationary contract. She was supervised by the Dean of Arts and Humanities.[1]

Under a probationary contract, if an administrator becomes aware of a deficiency in a

---

[1] Unless otherwise indicated, the facts have been taken from the exhibits annexed to Documents # 32 and # 20.

teacher's performance, the administrator must work with the teacher to overcome the deficiency. If a decision is made not to renew the contract for the following academic year, the College must notify the teacher in writing by April 1. The teacher can then appeal the decision to the Board of Trustees. After serving for four years under a probationary contract, faculty members are eligible for tenure.

Smith began teaching in the fall of 2006. In her first semester she taught American literature, multicultural literature, and two sections of English 1111, an introductory composition course. Although her first-semester courses were selected for her, Smith believed that as a generalist she would have complete autonomy in subsequent semesters to choose which courses to teach. At her deposition she stated, "I could teach anything." (Doc. # 32, at 15). For the spring 2007 semester, Smith chose to teach one section of multicultural literature and three sections of English 1111. Smith received high marks on her first annual performance review and was rated outstanding by her students and colleagues. (Doc. # 35-1).

Smith's second annual review took place in July 2008. The review was conducted by Dean Donald Killeen, who had assumed the position of Dean a few months earlier. Dean Killeen's two-page review of Smith was positive overall and noted Smith's success with the students. The review did, however, offer suggestions for the upcoming 2008–09 year. The first suggestion was written as follows:

> You have done an admirable job in developing your approach to ENGL 1111. My concern is that it is time to broaden your repertoire of courses since you were hired into the English generalist position two years ago. I would like to see you take on ENGL 1110 and ENGL 1120 over [the] next two or three regular semesters in addition to the two literature courses that you have been working on. I believe that having a broader background will increase your value to the college and your colleagues.

-2-

(Doc. # 32-15, at 2).  Smith had indeed been narrowing her range of courses.  In addition to choosing three ENGL 1111 courses for the spring 2007 semester, she chose seven sections of ENGL 1111 and only one section of multicultural literature for the 2007–08 academic year.  (See. Doc. # 32-15).

Smith did not heed Dean Killeen's suggestion to broaden her repertoire of courses and signed up for three sections of ENGL 1111 for the Spring semester 2009.  Upon learning this, Dean Killeen emailed Smith:

> I was just looking over the schedule for spring 2009 and note that you have signed up for three ENGL 1111.  I want to remind you that I have asked you to broaden your repertoire of courses and that this should start with the spring semester.  If you need to chat about this please see me.

(Doc. # 32-16).  Smith replied:

> As I have done since my second semester here, I am exercising my right [to] choose which courses I want to teach.  Therefore, I will be teaching three English 1111s in spring 2009.  Perhaps, in the future, I will choose a different teaching load.  Then again, perhaps, I won't.  Now that all has been laid bare, it is my hope that this issue has been resolved.

(Id.).  A few days later, Dean Killeen asked to speak with Smith.  They met, and Dean Killeen memorialized the discussion in a letter dated November 10, 2008:

> [Y]ou reinforced that you planned to stick by your e-mail and that you would not change your schedule as I have advised you to do....As your supervisor, I have the right to craft a schedule for you.  Since taking this action would go against my leadership style, I do not plan to exercise this right and will leave your schedule as is for spring.  Please know that your decision to go against my advice and your e-mail response to me will have consequences.

(Doc. # 32-19, at 2).

Although Dean Killeen did not alter Smith's Spring semester schedule, Smith's defiance was met with consequences in January when the President of the College sent her a non-renewal

letter: "Please be advised that the College has decided not to renew your appointment as a faculty member at the conclusion of your current probationary contract." (Doc. # 32-21). The President explained why:

> You were initially hired as an English generalist, and the College needed and continues to need an English generalist who can and will teach a variety of courses. Your refusal to meet the College's expectations has led me to conclude that your probationary contract should not be renewed.

(Doc. #32-22).

Smith filed a grievance with the help of her union to challenge the non-renewal. A hearing was held before an arbitrator in November 2009, and a decision was rendered on March 23, 2010. The arbitrator affirmed the non-renewal, finding that the procedural requirements had been met. The arbitrator concluded that, after carefully examining the evidence, there was not a scintilla of evidence in the record of race discrimination by Dean Killeen or the College. (Doc. # 32-29, at 37–38). This lawsuit followed. What remains of the case, after the Court dismissed several claims (see Docs. # 17, 23), are claims of race discrimination.

Smith's theory of race discrimination is that the concern over her course selection and, in turn, the decision not to renew her contract were motivated by race-based animus. A key player, according to Smith, was Meryl Soto-Schwartz, a co-chair of English department, who had supposedly demonstrated a pattern of hostility toward African-American faculty members.

Stephania Byrd, an African-American faculty member of the English department since 2001, claims that Soto-Schwartz tried to have Dean Killeen terminate Byrd's employment because she did not return from an academic trip to Africa when Soto-Schwartz thought she should have. (Doc. #35-2). Byrd asserts that without her union's help Dean Killeen would have

-4-

fired her. (Id.). Byrd believes that Soto-Schwartz's actions were motivated by race and that, in general, she has a negative attitude toward African-Americans. (Id.).

Barbara McEachern, also an African-American, was a faculty member at the College from 1976 until her retirement in 2008. (Doc. # 35-3). When she retired she was one of only two African-American tenured faculty members out of more than one hundred. (Id.). McEachern also had a bad experience with Soto-Schwartz. She claims Soto-Schwartz made an unfounded complaint to the Assistant Vice President simply because the two of them disagreed about the terminology of a benefit plan. (Id.). McEachern believes Soto-Schwartz made the complaint because of race. (Id.).

Both Byrd and McEachern believe Smith was subjected to Soto-Schwartz's race-based hostility during a department meeting in March 2008. In front of the entire faculty, Soto-Schwartz singled out Smith to ridicule and verbally abuse her because Smith had chosen to teach three courses of English 1111 for the Fall 2008 semester. (Doc. # 35-1). In support of their belief that Soto-Schwartz's actions were motivated by race, Smith, Byrd, and McEachern point out that Soto-Schwartz has never subjected a white faculty member to ridicule or abuse and has never concerned herself with the course selection of a white faculty member (or, for that matter, any other faculty member, white or African American). (Docs. # 35-1, 35-2, 35-3). They also point out that Dean Killeen has never concerned himself with the course selection of any other member of the English department. (Id.). (Of course, at the time of Smith's annual review, when Dean Killeen first raised the issue course selection, he had been only been Dean for a few months.)

Smith admits she has no written documentation demonstrating race-based hostility or

animus. (Doc. # 32-14). Nor does she have any evidence of any oral statement by Dean Killeen showing racial animus. In addition, Smith points to no written evidence or testimony showing Soto-Schwartz had any influence on Dean Killeen's decision to recommend non-renewal. Thus the theory that race motivated Dean Killeen's decision is based on a series of inferences.

## II. ANALYSIS

### A. Standard of Review

Defendant moves for summary judgment pursuant to Federal Rule of Civil Procedure 56. Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(a). The party that bears the burden at trial must, after adequate time for discovery, offer enough evidence to establish the existence of every element in that party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The Court must draw all reasonable inferences in the light most favorable to the nonmoving party. LaPointe v. United Autoworkers Local 600, 8 F.3d 376, 378 (6th Cir. 1993). If, after reviewing the record as a whole, a rational factfinder could not find for the nonmoving party, summary judgment is appropriate since there is no genuine issue of material fact for determination at trial. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

### B. Prima Facie Case

To establish a prima facie case of discrimination, a plaintiff must prove the following: (1) she is a member of protected class; (2) she suffered an adverse employment action; (3) she was qualified for the position; and (4) she was replaced by a person outside the protected class or was treated differently than similarly-situated, non-protected employees. McDonnell Douglas

Corp. v. Green, 411 U.S. 792, 802 (1973); Wright v. Murray Guard, Inc., 455 F.3d 702, 707 (6th Cir. 2006). Defendant does not dispute the first three elements but asserts that Plaintiff cannot show she was treated differently than similarly-situated, non-protected employees. Defendant ignores, however, the alternative way in which the fourth element can be met: by showing that Plaintiff was replaced by a person outside her protected class. Clayton v. Meijer, Inc., 281 F.3d 605, 610 (6th Cir. 2002). The evidence shows that Plaintiff was replaced by Angela Weaver, who is white–that is, by someone outside Plaintiff's protected class. (See Doc. # 35-1). Accordingly, the Court is satisfied that Plaintiff has made out a prima facie claim for race discrimination.

### C. Articulated Reason for Adverse Action

After a plaintiff establishes a prima facie case, the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. Upshaw v. Ford Motor Co., 576 F.3d 576, 584 (6th Cir. 2009). Here, the President of the College gave a legitimate, non-discriminatory reason for not renewing Plaintiff's probationary contract in his letter to Plaintiff dated January 27, 2009:

> You were initially hired as an English generalist, and the College needed and continues to need an English generalist who can and will teach a variety of courses. Your refusal to meet the College's expectations has led me to conclude that your probationary contract should not be renewed.

(Doc. #32-22).

### D. Pretext

After a defendant provides a legitimate, non-discriminatory reason for the adverse employment action, the burden shifts back to the plaintiff, who must prove that the reasons

-7-

offered by the employer were pretextual.  Upshaw, 576 F.3d at 584.  This, then, is the heart of the dispute.  Stated in terms of the summary judgment standard, the question is whether a rational factfinder could find that Plaintiff has proved that the reason given for not renewing her contract was pretextual.

A plaintiff may show that the defendant's articulated reason for its employment action was pretextual by showing that the reason (1) had no basis in fact, (2) did not actually motivate the challenged conduct, or (3) is insufficient to explain the challenged conduct.  Id. at 586.  The plaintiff must produce sufficient evidence from which the jury could reasonably reject the defendant's explanation and infer that the defendant did not honestly believe in the proffered non-discriminatory reason for its adverse employment action.  Mickey v. Zeidler Tool & Die Co., 516 F.3d 516, 526 (6th Cir. 2008).  The jury may not reject an employer's explanation unless there is a sufficient basis in the evidence for doing so.  Upshaw, 576 F.3d at 586.

Plaintiff first asserts that Defendant's explanation is insufficient to explain the challenged conduct.  The Court rejects this assertion.  Plaintiff's stubborn refusal to comply with her supervisor and to broaden her course selection–she was a generalist, after all–is a sufficient reason to non-renew a probationarycontract.

Next, Plaintiff argues that Defendant's action was not *actually* motivated by Plaintiff's refusal to broaden her course selection.  To show this, Plaintiff urges the Court to focus on "Soto-Schwartz's role and influence upon Dean Killeen...." (Doc. # 35, at 9).  Plaintiff further argues:

> A jury could certainly reject Defendant Lakeland's alleged non-discriminatory
> reason for the non-renewal of Plaintiff's probationary contract after hearing that in
> 2008 Soto-Schwartz the architect engaged in a pattern of racial discrimination

> against three (3) African American employees....Soto-Schwartz's influence over Dean Killeen cannot be underestimated when she was nearly successful in having him terminate Byrd[,] a tenured Professor.

(Id. at 9–10).

The Court disagrees. There is no evidence that Soto-Schwartz played any role in the Dean's decision to recommend terminating Plaintiff. The best the Plaintiff offers is circumstantial evidence based on speculation. Plaintiff certainly had adequate time for discovery and could have gathered evidence in an effort to establish some connection between Soto-Schwartz and the Dean. Plaintiff could have deposed the Dean and asked him why he became concerned about her course selection and what influence, if any, Soto-Schwartz had on him. In addition, Plaintiff could have deposed Soto-Schwartz to ask her about her interactions with the Dean. But Plaintiff chose not to, instead relying on the affidavits of Byrd and McEachern and their speculative beliefs that Soto-Schwartz enlisted the Dean to further her purported race-based agenda.

Furthermore, Plaintiff of her own volition chose to disregard a directive of her supervisor, the Dean, after having been warned expressly in writing of the consequences. If the Dean had never said a word to Plaintiff about her course selection and then surprised her one day with a letter of non-renewal, a reasonable jury could conclude that Defendant's proffered rationale was pretextual. But what happened is vastly different. Plaintiff not only limited her range of courses; she also obstinately refused to follow orders. Furthermore, the directive itself was proper–that a generalist should be willing to teach a broad array of courses–and Plaintiff was given a fair opportunity to comply, for the Dean originally told her in July 2008 to broaden her courses and reminded her twice in the Fall to do so. It was only then, in January of 2009, that the College

decided not to renew her probationary contract.

Finally, Plaintiff makes much of the fact that Soto-Schwartz and the Dean treated her differently from other faculty members. Perhaps it is true that neither Soto-Schwartz nor the Dean ever raised the issue of course selection with another faculty member. But comparing Plaintiff to other faculty members is comparing apples to oranges: there is no evidence that any other faculty member–white or African-American–so narrowly limited her course schedule, and no other faculty member consciously and deliberately disregarded the Dean's directives. In fact, Plaintiff, as a probationary faculty member, should have been particularly cognizant of any legitimate directive from the Dean. There were therefore valid, non-racial reasons for treating Plaintiff differently, and Plaintiff has provided no evidence that she was subjected to different terms and conditions of employment on the basis of race.

### III. CONCLUSION

In sum, Defendant has provided a legitimate, non-discriminatory reason for its adverse employment action, and the evidence shows that Defendant honestly believed in its proffered non-discriminatory reason. Although Plaintiff asserts that what actually motivated Defendant's action was race, Plaintiff's assertion relies on inferences derived from speculation. Thus, Plaintiff has provided insufficient evidence from which a jury could reasonably reject Defendant's explanation and thereby conclude that Defendant's decision to non-renew Plaintiff's contract was pretextual.

Accordingly, Defendant's Motion for Summary Judgment (**Doc. # 33**) is hereby **GRANTED** in full and judgment is entered in favor of Defendant.

**IT IS SO ORDERED.**

                                            */s/ Dan A. Polster*
                                            **Dan Aaron Polster**
                                            **United States District Judge**

Dated: November 8, 2011